ALLEN B. SPOTZ, Plaintiff-Appellee, *v.* UP-RIGHT, INCORPORATED, Defendant-Appellant.

(No. 71-58; ▉▉▉▉▉▉

Second District—March 2, 1972.

Howard & French, Stanton, Healy & Brow and Edwin A. Strugala, all of Chicago, and Crowe, Stanton & Healy, of Dundee, for appellant.

Robert J. Shaw, of Rockford, for appellee.

Mr. JUSTICE ABRAHAMSON delivered the opinion of the court:

The plaintiff, Allen B. Spotz, a painter employed by Karl Schoening & Sons, was working at Estwing Manufacturing Co., spray-painting walls and ceilings, and was using an Up-Right aluminum scaffolding. While working on that job, the plaintiff and a Michael McFadden, a co-employee, erected two scaffolds manufactured by Up-Right. Thereafter, on December 23, 1966, plaintiff and McFadden, after completing their painting, proceeded to dismantle one of the scaffolds. As they raised the platform over the top of the frame, each end of the scaffold fell outward and both men fell to the concrete floor, plaintiff falling into a pile of hammers and sustaining severe displaced fractures of the left distal fibula and tibia. McFadden was not injured. The plaintiff was hospitalized until January 10, 1967, and did not return to work as a painter until January, 1968.

Plaintiff sued Estwing and Up-Right in a two-count complaint. Before trial, plaintiff voluntarily dismissed Estwing who had been sued under Count I, and Estwing dismissed its third-party indemnity action against the plaintiff's employer, Schoening & Sons. Later, plaintiff obtained leave to file an amended complaint as to Count II, which was against Up-Right, and it was predicated solely on strict liability in tort for a product defect of original manufacture. Upon motion of Shoening, the trial judge severed Up-Right's indemnity action against Schoening. Upon trial, the jury returned a verdict in favor of plaintiff for $30,000 and against Up-Right. Defendant's post-trial motion for judgment n.o.v., or alternatively for a new trial, was denied, and the defendant has appealed.

Defendant contends that there was insufficient evidence of an unreasonably dangerous condition or defect in its product at the time it left its control, or that such condition or defect, if any, proximately caused plaintiff's injury. Defendant further states that, as a matter of law, it was plaintiff's own misuse and abuse of the product which proximately caused his injury; that under the facts, as presented to the jury, defendant's motion for judgment notwithstanding the verdict should have been granted. Defendant's alternative contention is that a new trial should have been granted because the verdict of the jury was against the manifest weight of the evidence; that plaintiff's counsel

committed prejudicial and reversible error in questioning the plaintiff, and one of plaintiff's instructions was erroneously given by the trial judge to the jury.

Because of the nature of the contentions presented herein, it is necessary to review the testimony elicited during the trial in some detail. When the plaintiff went to work on the Estwing job, his superintendent, Al Grenda, delivered two Up-Right scaffolds to the jobsite, and the plaintiff and McFadden testified that they assembled the scaffolds. Each scaffold was erected by taking 6-foot end frames that looked like ladders but the rungs were actually rods; locking the wheels at the bottom of each end frame; attaching a bottom horizontal brace to each end section; and then taking one of two 10-foot, 4-inch braces, and starting on the second rod of the end frame, one end was attached to the second rod and the other end attached to the fourth rod of the other end frame. The second 10-foot, 4-inch brace is reversed so that between the two end frames we have cross braces, or scissor braces; next, two extension pieces or 3-foot additions were added to the 6-foot end frames, and the platform was put on the next-to-the-top rods. After the cross braces are in place, but before the platform is put on top of the scaffolding, the scaffolding can be rolled around and it was stated by both men to be solid and rigid so that two men could climb on it at that time.

The testimony was that the plaintiff and McFadden had used one or the other scaffolds every day on the Estwing job. Plaintiff further testified that he made a habit of inspecting scaffolds for visible defects, particularly when assembling the scaffolds and that both men are well acquainted with this type of scaffolding, which is normally strong and rigid.

On December 23, 1966, they decided to take one of the scaffolds down. To dismantle the scaffold is a two-man job. After locking the wheels, the plaintiff and McFadden each climbed one end of the frame to a point high enough to lift the platform over the top of the frame. As they raised the platform over the top of the frame, both ends of the scaffold fell outward, although the wheels remained stable. Both men fell to the floor, and the plaintiff received the injuries previously mentioned. After the accident, McFadden picked up a broken piece which was a claw clamp that apparently had separated from one end of a cross brace, and took it with him to the shop where he gave it to Grenda. Grenda inspected the claw at that time and stated, "I don't see any place where it's been welded together." Several days later, Grenda went to the Estwing jobsite and picked up the broken rod that was supposed to have the claw on the end. He took the broken rod, or brace, back to the shop where he was able to insert the claw and take it out of the rod, and stated, "About

the weld or welds, as to that claw and that rod at that time, it was obvious to me that the weld didn't hold, otherwise you couldn't have pulled the claw out." Grenda kept the claw in a box, but the claw was lost in the process of moving long before the trial took place. Grenda also testified that he noticed there was "a little burn spot" on the side of the claw "about the size of a dime" where a weld union should have been, but the surface was smooth and it did not appear that there was any penetration of the weld into the claw portion. At the same time, he inspected the other end of the rod, and tried to pound the claw out of the rod but it was secure.

A Mr. Herman, an expert witness for the plaintiff, and a research development engineer, following a hypothetical question as to the cause of the separation of the claw from the tube, stated that the claw had not originally been welded to the tube and that it existed as a useful member because of its original construction and from the heat applied in the original effort to make the weld. He said it was a "friction fit" and he could not determine how long an unwelded friction fit claw would remain attached to the tubing; that questions concerning how long it would remain attached were almost impossible to answer. He further stated, as to the cause of the collapse of the scaffold, that if one of the diagonal bracing members was taken off, the scaffold would normally fall.

Defendant's witness, Marshall Klarfeld, with an assistant, erected a 9-foot scaffold in front of the jury, from directions received from the plaintiff. As constructed under the directions of the plaintiff, the plaintiff testified it appeared sturdy. Upon direct examination of Klarfeld, he stated that if the claw pulled out of one of the diagonals in the scaffolding, as erected by the plaintiff, the end pieces would fall apart.

In arguing that the plaintiff had not produced sufficient evidence to justify the verdict of the jury, the defendant states that when the plaintiff was testifying as an adverse party, and in directing the erection of the 9-foot scaffold similar to the one he and McFadden had assembled and used, there was no brace of any kind used to connect the 3-foot-high ladder-type extensions mounted on top of the 6-foot end extensions; that only the platform, which also has claws, or clamps, on its ends, was used and it rested on the next-to-the-top rung of the 3-foot extensions. The platform so-erected was conceded by the plaintiff to be "wiggly." Nevertheless, plaintiff testified that it was sturdy and stable and safe to work on, and that this is the only way he has ever worked on them.

Grenda, during his testimony, illustrated on a blackboard the proper and customary use of the 9-foot scaffold. His drawing shows another horizontal brace and a scissors brace connecting the 3-foot extensions

just below the platform, or altogether a double set of braces. However, it is clear that the plaintiff and McFadden did not use a double set of braces on the Estwing job, there being no braces on the 3-foot extensions.

It is further argued that Herman, the plaintiff's expert, gave his opinion as to the cause of separation as being a failure to weld in the original manufacture, although the scaffolding was some 15 years old. He assumed in the hypothetical question asked that the scaffolding had "nominal use" during the 15-year period. He conceded that full-time use, as testified to by Grenda, over a period of 15 years is a heavy use and not a nominal use; and at no time answered the question as to whether an unwelded casting would remain affixed to the tubing during 15 years of heavy use. It is further pointed out that no hypothetical question was asked of Herman in which the absence of a double set of braces was incorporated. He was not asked his opinion as to the effects, if any, on the alleged separation caused by the lack of any scissors braces on the top 3-foot sections.

Schoening, the only other person who saw the claw after the accident, besides Grenda, stated he could "just faintly recall that it looked like some weld had broken somewhere." It is also noted that Herman testified that he performed no strength of material test to determine the sheer factor of any weld on a brace and could not state whether any twisting or unusual stress could have resulted in the sheering of the weld, assuming that one had been there. He further stated that it "would be totally guesstimation to tell you specifically how much weight a union of this type should bear." The union he was referring to was a friction fit.

The defendant states that in a case of this type strict liability does not prove itself and that the plaintiff, to hold a manufacturer strictly liable in tort for injury alleged to have been caused by the manufacturer's product, must prove that the injury resulted from a condition of the product; that the condition was unreasonably dangerous; and that the condition existed at the time it left the manufacturer's control. (*Suvada v. White Motor Company*, 32 Ill.2d 612.) Defendant concedes that the product defect need not manifest itself at once (*Dunham v. Vaughan & Bushnell Mfg. Co.*, 42 Ill.2d 339), but states that it is the plaintiff's burden to prove that a defect of original manufacture proximately caused his injury. (*Williams v. Brown Mfg. Co.*, 45 Ill.2d 418, 431.) Defendant states that there are at least four possible causes for the separation of the claw from the tube, and they are: 1) a manufacturing defect; 2) a defect resulting from rough handling over a period of 15 years and heavy use; 3) misuse or abuse, or both; and 4) impact

separation caused, by the heavy plywood platform falling on and striking the brace and other scaffold parts. Defendant, therefore, says that the trial judge should have entered a finding of not guilty at the close of the plaintiff's case and at the close of all of the evidence, or at least should have entered a judgment *n.o.v.* in favor of the defendant because the plaintiff did not present evidence from which it is reasonable to infer that the separation more probably than not was one for which the defendant is responsible.

· Defendant says that from the evidence it is apparent that the plaintiff was not using the scaffold in the intended or normal manner, that is, he should have had scissors braces on the top 3-foot extension, whereas it is conceded that none were used. The defendant also points out that plaintiff's expert testified that he had never heard of a separation such as the one that occurred here, and in answer to a hypothetical question, assumed a nominal use, whereas the use was heavy rather than nominal over a period of some 15 years. It is said, therefore, that the testimony of the plaintiff's expert is worthless. Defendant makes it clear that he does not contend that the non-existence of the brace and claw, which could not be produced at the time of trial for reasons hereinbefore stated, without more constitute a fatal failure of proof on the plaintiff's part, but cites *Shramek v. General Motors Corp.*, 69 Ill.App.2d 72, as authority for the proposition that circumstantial evidence could not be used as the sole basis for meeting the required burden of proof. In *Shramek*, an automobile tire was involved which had been in use for eight months and traveled over 10,000 miles. The defendant herein cites *Shramek* because the plaintiff there, in addition to being unable to produce the alleged defective product for examination, was also unable to negate other possible causes of the product's failure. Here, it is said the defendant does not guarantee that its product will not show the effects of wear, resulting from heavy or abnormal use, and that the manufacturer is under no duty to furnish equipment which will not show the effect of wear. (*Jakubowski v. Minnesota Mining & Mfg.* (Sup. Ct. N.J. 1964), 199 A.2d 826; *Prosser, The Fall of the Citadel,* 50 Minn. Law Review, 791, 854.) Defendant says that plaintiff's own witness, Grenda, and both parties' experts, in effect testified to misuse here. Defendant cites *Williams v. Brown Mfg. Co.*, 45 Ill.2d 418, 431, wherein it was said that plaintiff's misuse of the product may bar recovery, and that this issue may arise in connection with plaintiff's proof of an unreasonably dangerous condition or in proximate causation, or both. Thus, it is said that plaintiff's proof is insufficient as a matter of law.

It is true that, in *Shramek*, the court said at page 78:

"Thus, without any examination of the tire designed to elicit the cause of the blowout and without the tire itself or any hope or expectation for its recovery, plaintiff could never prove, directly or inferentially, a case of negligence, breach of warranty or strict liability."

However, in our case, the scaffolding was inspected by Grenda, the superintendent, when it was delivered to the jobsite; it was also inspected by the plaintiff, who had been a painter for 25 years, and McFadden, before it was erected, and was found to have no apparent defects. When being dismantled, the scaffold revealed, upon collapse, that the claw end of a cross bar separated from the brace. The claw end that had separated was later inspected by Grenda, and his testimony about a little burn spot, where a weld union should have been, has been previously stated.

■■ In *Nolan v. Shaf Manufacturing Company*, 128 Ill.App.2d 19, an aluminum ladder had collapsed, but the ladder could not be produced at trial. After referring to the *Shramek* case and *Texaco, Inc. v. McGrew Lumber Co.*, 117 Ill.App.2d 351, the court concluded that it was not indispensable that the ladder itself be produced at trial. The facts in our case are similar to those in the *Texaco* case, and we also observe that *Shramek* did recognize that a defect, in a proper case, could be proved by circumstantial evidence under the *Suvada* theory.

In *Taylor v. The Carborundum Co.*, 107 Ill.App.2d 12, in commenting on the *Shramek* and *Jakubowski* decisions the court stated at page 19:

"The discussions in both opinions pointing to possible causes of the product failure other than a defect in manufacture were premised upon the absence of direct proof of a defect. Such is not the situation in the instant case where, by means of expert testimony, direct proof of a defect in the product was adduced with the reasonable inference left to be drawn by the jury that it came into existence at the time of manufacture. There was, therefore, sufficient evidence to allow the question of a defect to go to the jury, for a plaintiff is not required to prove his case beyond a reasonable doubt or disprove every theory supporting a cause of failure other than the one alleged."

Although the defendant mentions four possible causes for the scaffold collapsing in this case, it was not incumbent upon the plaintiff to disprove all other possible causes. Other possible causes cannot be excluded with certainty, but where there is sufficient evidence based upon the testimony of several witnesses to substantiate the claimed cause of the collapse of the scaffold, a jury question is presented as it is only necessary that the conclusion arrived at by the jury be based on an inference

that is, itself, reasonable under the facts. (*Foster v. Union Starch & Refining Co.*, 11 Ill.App.2d 346.) A verdict is not to be set aside because the jury could have drawn different inferences or because we, as judges, feel that other conclusions would be more reasonable. In *Lindroth v. Walgreen Co.*, 407 Ill. 121, it was stated at page 136:

"Only when there is a complete absence of probative facts to support the conclusion drawn by the jury is it reversible error to overrule a motion for judgment notwithstanding the verdict."

██ Although we have commented on part of the testimony and have not gone into all the evidence in detail in this opinion, we have thoroughly examined the transcript of testimony. While there is some evidence of misuse and/or abuse in the record, there is direct and possitive testimony as to the collapse of the scaffold having been caused by the failure to weld the claw to the tube during the manufacturing process and before the product left the manufacturer. There is no complete absence of probative facts, and the trial court properly overruled defendant's motion for a finding of not guilty at the close of the plaintiff's case and at the close of all the evidence. Also, the court did not err in refusing to enter a judgment *n.o.v.* in favor of the defendant. For the same reasons, we cannot say that the verdict of the jury is against the manifest weight of the evidence.

██ Defendant claims his motion for a new trial on the grounds of prejudice resulting from the giving of a certain instruction, and from the conduct of plaintiff's attorney, should have been granted. The plaintiff's instruction referred to concerns whether the metal claw was properly welded; whether insufficient heat was used in the welding to fuse the two members; and whether the welding process was of insufficient quality and strength to serve the purpose for which the claw and brace were manufactured. This instruction was given without a specific objection and, therefore, we will not consider such an objection when raised for the first time on appeal. The general objection by the defendant to this instruction did not properly preserve a specific objection, not made, for review. (*Gilman v. Lee*, 23 Ill.App.2d 61.) The conduct of the plaintiff's attorney is said to be prejudicial and constitutes reversible error because the plaintiff testified that he had been in military service for six years, had a large family, and the sadness existed of suffering injury on Christmas Eve. Part of this testimony was volunteered by the plaintiff and not solicited by questions of the plaintiff's attorney. Whe asked questions pertaining to his family, objection was made as to the relevancy of that testimony, and it was not pursued further. The error, if any, was unintentional and, we believe, a harmless error.

For the reasons stated, the trial court properly overruled appellant's motions for a directed verdict and for judgment notwithstanding the verdict, and properly overruled appellant's motion, in the alternative, for a new trial. Therefore, the judgment of the circuit court of Winnebago County is affirmed.

Judgment affirmed.

SEIDENFELD and GUILD, JJ., concur.