Ronald Larson *et al.*, Plaintiffs-Appellees, *v.* Saul L. Thomashow, Defendant and Counterplaintiff-Appellant.—(General Motors Corporation, Defendant and Counterdefendant-Appellee.)

(No. 57906;

First District (4th Division)—January 16, 1974.

Van Duzer, Gershon, Jordan & Petersen, of Chicago (John B. Van Duzer and Horace W. Jordan, of counsel), for appellant.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (D. Kendall Griffith and Donald J. O'Meara, of counsel), for appellees.

Baker and McKenzie, of Chicago (Francis D. Morrissey, Peter J. Mone, and Edward R. Duncan, Jr., of counsel), for counterdefendant-appellee.

Mr. PRESIDING JUSTICE ADESKO delivered the opinion of the court:

The appeal in this case arises from an automobile collision that occurred on April 27, 1966, on the Edens Expressway in Chicago, Illinois. The defendant-appellant, Saul Thomashow (hereinafter defendant), appeals from a verdict and judgment against him and in favor of the plaintiffs Ronald Larson and Wilfred Larson. The plaintiffs' complaint charged the defendant with negligence and the jury found for the plaintiffs and awarded Ronald Larson $17,300 in damages and Wilfred Larson $1,555. The defendant also appeals from the directed verdict which was entered in favor of General Motors on the defendant's counterclaim. The defendant's counterclaim in Count I was based on a theory of strict liability and in Count II on a theory of breach of express and implied warranty. At the close of the defendant and counter-plaintiff Saul Thomashow's case, the trial court granted the counter-defendant General Motors' motion for a directed verdict. The defendant raises several issues in this appeal. The defendant contends that the trial court should have directed a verdict in his favor and against the plaintiff, Ronald Larson, because Ronald Larson was contributorily negligent as a matter of law. The defendant also contends that the plaintiffs failed to prove that he was negligent. The trial court refused to submit to the jury a special interrogatory tendered by the defendant and the defendant maintains this was error. It is also asserted that the jury verdict in favor of Ronald Larson is excessive. Finally, the defendant contends the trial court erred in directing a verdict in favor of General Motors. We find no merit in any of these contentions.

On the evening of April 27, 1966, between 8:00 and 8:30 P.M., the defendant was driving his 1964 Chevrolet Chevelle northbound on the Edens Expressway. The defendant's vehicle had been purchased new from Z Frank Chevrolet Company in December of 1963 and had been manufactured by General Motors Corporation. There are three northbound lanes on the Edens Expressway and the defendant was traveling in the outermost left hand lane. There is an emergency lane wide enough for an automobile adjacent to this lane. The defendant testified that there was a six inch grade difference between this emergency lane and the lane in which he was traveling. However, the plaintiffs introduced as an exhibit a picture of the area where the collision took place and it depicts that there is no grade difference. As the defendant was proceeding in the outermost left hand lane at 55 to 60 m.p.h., he heard a horrible noise and banging and felt a strange sensation. The defendant stated that, "From inside the car, it felt as though there was something underneath the car that was banging the underside of the car and hitting the ground, and ricocheting, if you will, between the ground and the underside of the car." The defendant's vehicle began to lose speed and coasted to a stop. It took approximately a minute between the time the defendant first heard the noise and the time the automobile stopped. The defendant testified that during this interval he did not turn the car to the left. Defendant also stated that at no time did he attempt to drive his vehicle onto the emergency lane to his left. As the automobile came to a stop, the defendant put on his left turn signal, rolled down his window, and gave a hand signal.

The defendant got out of his car and saw that the drive shaft had fallen from the rear axle. The rear part of the drive shaft was lying on the ground and it was spinning. The drive shaft was digging a hole into the pavement and was sparking. The defendant shut the motor off and then looked underneath the vehicle again and observed that the drive shaft had stopped rotating. The defendant raised the hood of the car and stated that he tried to push it from the rear but that he was unable to do so. At this time the defendant proceeded to the rear of the vehicle and spent five or ten minutes waving at traffic. The defendant testified that his rear taillights were on and that the left blinker was flashing. The defendant then proceeded across the highway to the east to seek assistance and while on the east embankment he heard a collision. It was the defendant's testimony that immediately upon hearing the collision he turned around and observed his automobile bursting into flames. The defendant stated that it traveled approximately 50 feet northeasterly across the three lanes of traffic.

The plaintiff, Ronald Larson, was driving the vehicle that collided with

the defendant's vehicle. The vehicle was owned by the plaintiff, Wilfred Larson, and he testified that it was a 1963 Ford which was in good mechanical condition and had between 40,000 to 50,000 miles on it. He stated that prior to the accident the lights and windshield were in good operating condition. Ronald Larson testified that he was driving home on the evening of April 27, 1966. He stated he was traveling northbound on the Edens Expressway in the center lane going between 50 and 55 m.p.h. He was following a truck and decided to pass it by moving into the outermost left hand lane. After he was completely inside the outermost left hand lane he stated he observed the rear end of the defendant's vehicle but that he could not determine whether it was moving or stopped. Ronald stated, "In a matter of seconds after seeing this car, all I remember at this time was bringing my face up off the steering wheel and the collision had happened at that time." Ronald Larson was traveling at approximately 55 to 60 m.p.h. and was in the operation of applying his brakes but there was no braking before the collision. He stated that prior to the collision he did not observe any flashing lights or flares nor did he observe a hood up on the vehicle which he struck. He also testified that he could see the taillights of the defendant's vehicle but he could not tell whether or not the lights were on or off. The front end of the vehicle Ronald Larson was driving struck the rear end of the defendant's automobile.

After the collision Ronald Larson was taken to the Skokie Valley Hospital and was treated for injuries to his mouth and teeth. He was hospitalized for three days and remained under doctor's care until June of 1966. Ronald was unable to talk for the first few days after the accident and could not eat solid foods for two months. He was treated by a dentist for the damage to his teeth. Ronald was unable to work at his part-time employment from the date of the accident until May 6, 1966. He returned to work for a short period but was again unable to work from May 19, 1966 to June 1, 1966. Ronald earned $1.95 per hour in his part-time employment. As a result of the collision Ronald suffered permanent scars on the lip, mouth, and chin area of his face. The red part of his lip was also less sensitive to touch than the rest of his lip. It was stated by the doctor who treated Ronald that the scars could be improved by further surgery. Ronald Larson also suffered extensive dental injuries as a result of the collision and in the opinion of the dentist who treated him, Ronald lost six functioning teeth and had an impacted cuspid as a result of the collision. In addition Ronald testified that he was unable to seal his lips for a period of six months and was therefore unable to contain saliva or liquids within his mouth.

There was also testimony as to the condition of the defendant's automobile and the repairs that had been made to it from the date of purchase. This evidence will be set forth and discussed in relation to the defendant's contention that the trial court erred in granting General Motors' motion for a directed verdict.

■■ The defendant maintains that the trial court should have directed a verdict against the plaintiff, Ronald Larson, because he was contributorily negligent as a matter of law. This contention is premised upon the assertion that Ronald Larson was not maintaining a proper lookout as required by the law. The standard applied in determining whether or not to grant a directed verdict or a judgment *n.o.v.* was set forth in the celebrated case of *Pedrick v. Peoria & Eastern R.R. Co.* 37 Ill.2d 494, 229 N.E.2d 504 (1967):

> "In our judgment verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick, supra,* at 510; at 513—514.

It was also enunciated in the *Pedrick* decision that a similar standard should determine when negligence and contributory negligence questions become questions of law rather than questions of fact.

> "Logic demands that one rule govern both the direction of verdicts and determination of the presence or absence of negligence or contributory negligence as a matter of law, for in both situations the issue is whether a court or the jury should decide the negligence issue." *Pedrick, supra,* at 503 at 510.

The defendant asserts that Ronald Larson had a duty to be on the lookout for other automobiles moving or standing in the highway and to use every precaution to avoid a collision. (*Waldron v. Hardwick,* 99 Ill.App.2d 36, 240 N.E.2d 772 (1968); *Skamenca v. Reeser,* 294 Ill.App. 216, 13 N.E. 2d 668 (1938).) While we agree that such duties existed, this court is also cognizant of the decision in *Nei v. Contracting & Material Co.,* 93 Ill.App.2d 226, 236 N.E.2d 264 (1968). The court pointed out that there are numerous cases within this jurisdiction that have held that a person who collides with another in the rear is guilty of contributory negligence as a matter of law. However, it has also been established that such cases have to be decided on their own peculiar facts. The *Nei* decision is also authority for the proposition that the different conditions existing on modern urban highways must also be taken into account. The court stated:

> "Therefore, the circumstances which have led courts to find negli-

gence as a matter of law in rear-end collisions on other roadways are not necessarily controlling in rear-end collisions on high-speed, urban expressways." *Nei, supra,* at 230; at 266.

The evidence in this case shows that prior to the collision Ronald Larson was in the center northbound lane of the Edens Expressway traveling at between 50 to 55 m.p.h. and following behind a truck. He decided to pass the truck and stated that due to the truck his vision ahead to the right and left was partially obstructed. Larson checked for cars around him and then moved into the outermost left hand lane. Only upon completely arriving in this lane did he observe the defendant's vehicle and he could not determine whether it was moving or stopped. The defendant states in his brief that it is undisputed that his hood was up; the car lights were on; and that his left turn signal was blinking. However, the record clearly reflects that Ronald Larson testified that he could not determine if the defendant's taillights were on; that he did not see a flashing light; and that he did not observe the hood up on the defendant's vehicle. There was also evidence that immediately prior to the accident Ronald Larson was in the operation of applying his brakes but that there was no braking prior to the collision. The defendant maintains that the vision of Ronald Larson could only have been obstructed if he were tailgating the truck and even if he were tailgating he had vision in the passing lane the moment he started into that lane since he was on the left side of the car in the driver's seat.

■■ In accordance with the *Pedrick* rule, we must view all of the evidence in a light most favorable to Ronald Larson and determine whether that evidence so overwhelmingly favors the defendant that no contrary verdict could ever stand. Since this collision occurred upon one of our modern urban expressways, we must also take into account the unique conditions which exist upon them. (*Nei v. Contracting & Material Co., supra.*) On an expressway, traffic proceeds at a greatly increased rate of speed and is often more closely together than on other roadways. When following a vehicle such as a truck, the vision ahead into other lanes is definitely obstructed and limited. The outermost left hand lane is commonly accepted and authorized as the passing lane. It is the lane in which traffic is the most free flowing and in which the rate of speed reaches its maximum. As pointed out in Ronald Larson's brief, no one expects to find a stopped vehicle in this lane. Even with the view partially obstructed, it is not uncommon to proceed into the passing lane in order to overtake slower moving traffic. It would be unrealistic to say that one should not proceed into the passing lane until his vision is unobstructed for more than a few car lengths. Taking the conditions which exist upon our modern urban expressways into account and viewing the

evidence in a light most favorable to Ronald Larson, we cannot conclude that the trial court erred in not directing a verdict in favor of the defendant, nor that Ronald Larson was contributorily negligent as a matter of law.

> "Questions of negligence and due care are ordinarily questions of fact for a jury to decide. Questions which are composed of qualities sufficient to cause reasonable men to arrive at different results should never be determined as a matter of law. The jury is the tribunal under our legal system to decide that type of issue. To withdraw from the jury the determination of questions of fact is to usurp its function. *Ney v. Yellow Cab Co.*, 2 Ill.2d 74, 117 N.E.2d 74." *Stegmann v. Zachariah*, 46 Ill.App.2d 7, at 10, 196 N.E.2d 703, at 705 (1964).

There was certainly evidence in this case which made Ronald Larson's exercise of ordinary care a question of fact to be determined by the jury. While it is well established that in driving an automobile one must maintain a proper lookout and utilize all reasonable precautions to avoid a collision, the circumstances in which the collision in the case at bar took place were such as to make the question of what would constitute a proper lookout on Ronald Larson's part in order to be free from contributory negligence, an issue of fact to be decided by the jury.

The defendant cited the cases of *Pedrick v. Peoria & Eastern R.R. Co.*, *supra; Waldron v. Hardwick, supra;* and *Keen v. Davis*, 38 Ill.2d 280, 230 N.E.2d 859 (1967), and asserted that they held that a driver who fails to maintain a proper lookout and strikes a moving or standing vehicle is guilty of contributory negligence as a matter of law. However, none of these cases explicitly held this, but rather applied the standard enunciated in *Pedrick* and determined the propriety of granting or denying a directed verdict. Likewise, when we apply the *Pedrick* standard to the case at bar, we cannot conclude that the trial court should have directed a verdict against Ronald Larson.

■■ The defendant also contends that the plaintiffs failed to prove that he was negligent. The basis for this contention is that when the defendant was confronted with the sudden and unexpected emergency of his drive shaft falling out he did all that any ordinary prudent motorist would or could do under the circumstances. The defendant alleges that there was no conflict in the testimony as to the precautions he took to warn approaching motorists. However, as previously stated, there was a conflict in the evidence as to whether or not the defendant's hood was up; his taillights on; and whether or not his left turn signal was blinking. There was evidence in this case that immediately prior to the defendant's drive shaft falling out, he was travelling at 60 m.p.h. and that his vehicle

did not abruptly stop but rather coasted for a minute or so before stopping. During this interval he did not have any difficulty turning his wheels to the left but he did not attempt to pull onto the emergency lane. While the defendant testified that there was a grade difference of approximately six inches between the lane he was travelling in and the emergency lane, this was contradicted by plaintiffs' exhibit 2, which showed no grade difference. The jury could have determined, as it apparently did, that the defendant was negligent in not pulling his vehicle onto the emergency lane during the interval in which he was gradually losing speed. From the record in this case, we conclude that there was adequate evidence to constitute a sufficient basis for the jury's finding that the defendant was negligent.

In support of the defendant's contention on this issue, he cited *Sutton v. Harrison,* 117 Ill.App.2d 225, 253 N.E.2d 592 (1969), and stated that he did substantially everything done there by the defendant and that the Appellate Court affirmed the judgment against the plaintiff. However, the defendant in the case at bar fails to realize that the defendant in *Sutton* testified that, "He tried to get the vehicle completely off the highway but only the right front wheel was off before the car came to a stop." (*Sutton, supra,* at 227; at 593.) In this material and relevant aspect the defendant in the case at bar did not do substantially all that the defendant in *Sutton* did.

At the conference on instructions, the defendant tendered a special interrogatory concerning whether or not Ronald Larson was exercising ordinary care for his own safety immediately before and at the time of the occurrence. However, the trial court refused to submit the special interrogatory to the jury and the defendant maintains this was error. The defendant contends that the trial court had no choice and was required by section 65 of the Civil Practice Act to submit the interrogatory to the jury. Section 65 of the Civil Practice Act states: "The jury may be required by the court, and must be required on request of any party, to find specially upon any material question or questions of fact stated to them in writing." Ill. Rev. Stat. 1965, ch. 110, par. 65.

The question of Ronald Larson's contributory negligence was a material question of fact and it has been held that submitting a special interrogatory is mandatory and not a matter of discretion. (*Pushauer v. Demers,* 86 Ill.App.2d 251, 229 N.E.2d 908 (1967); *Hollis v. Terminal R.R. Association of St. Louis,* 72 Ill. App. 2d 13, 218 N.E.2d 231 (1966).) However, a limitation was placed on the mandatory nature of section 65 in the case of *Scully v. Otis Elevator Co.,* 2 Ill.App.3d 185, 194, 275 N.E. 2d 905, 911 (1971). The court stated:

"Special interrogatories are used to test the general verdict against

the jury's conclusions concerning the ultimate controlling facts. (Ill. Rev. Stat. 1969, ch. 110, par. 65; *Mathias v. Baltimore & O. R. Co.,* 93 Ill.App.2d 258.) When a special interrogatory is in proper form, the trial court has no discretion but to submit it to the jury. (*Pushauer v. Demers,* 86 Ill.App.2d 251.)"

Therefore, it is only when the form of the interrogatory is objectionable that the trial court has discretion in submitting it to the jury.

■■ The plaintiffs assert in their brief that the issue of whether or not the trial court erred in not submitting the defendant's interrogatory to the jury is not preserved for appeal since the abstract of the record and the record itself does not contain the conference on instructions. We agree.

"The abstract or excerpts are the pleadings of a case and must contain everything necessary to a decision on the issues. *Dempski v. Dempski,* 27 Ill.2d 69, 187 N.E.2d 734 (1963). In an appeal, all reasonable presumptions are in favor of the judgment or decree of the trial court, and it is the duty of the appellant to overcome these presumptions by affirmatively showing the errors charged." *Davis v. Davis,* 128 Ill.App.2d 427, at 429, 262 N.E.2d 788, at 790 (1970).

We must, therefore, presume the trial court acted correctly in not submitting the special interrogatory to the jury and that the rationale underlying its decision was that the interrogatory was not in the proper form. However, wihout a record of the conference on instructions, this court is not apprised of what was objectionable about the form of the interrogatory. We do not know if any objections were interposed as to the form of the interrogatory. We are left completely in the dark as to any discussion concerning the form of the interrogatory and the basis for the trial court's ruling. We are also not apprised of whether or not the defendant offered and was given an opportunity to resubmit the interrogatory in an unobjectionable form. Section 65 of the Civil Practice Act also requires that "Special interrogatories shall be tendered, objected to, ruled upon and submitted to the jury as in the case of instructions." (Ill. Rev. Stat. 1965, ch. 110, par. 65.) The abstract and the record itself does not contain everything necessary to reach a decision on this issue. While the special interrogatory in issue with the trial court's notation refused was included in the abstract and record, we cannot agree with the defendant that this is all that is needed to preserve the issue for appeal. It is therefore the opinion of the court that the issue of whether or not the trial court erred in not submitting the defendant's special interrogatory was not preserved for appeal and is not properly before this court.

Defendant next contends that the jury verdict in favor of Ronald Lar-

son was excessive and the result of passion and prejudice. The basis for this contention is that the jury's award of $17,300 in damages amounted to an award of $15,000 over and above what the actual out-of-pocket expenses were. The defendant maintains that this represents an award of over $2,000 per lost tooth and that this is double the generally accepted valuation in legal and casualty circles of $1,000 per tooth. As pointed out in the plaintiffs' brief, the defendant cited no authority for this generally accepted evaluation and in addition defendant completely ignores the other elements of damage proven at trial, *i.e.*, scars, loss of sensitivity in the lip, pain and suffering, future medical expenses, etc. It is within the province of the jury to ascertain the proper and adequate amount of a verdict. (*Lau v. West Towns Bus Co.*, 16 Ill.2d 442, 158 N.E.2d 63, 1959.)

> "The very nature of personal injury cases makes it impossible to establish a precise formula to determine that one award is excessive and another is not. Each case must be determined by its own circumstances having in mind that the trial judge and jury saw and heard the witnesses and are best able to determine that sum which will fairly compensate an injured plaintiff entitled to a verdict." *Rogers v. Gehrke*, 77 Ill.App.2d 343, at 345; 222 N.E.2d 351, at 352 (1966).

As a court of review, we cannot merely substitute our judgment for that of the jury and will not overturn its determination of a proper amount of damages unless its award is so excessive or inadequate as to indicate passion or prejudice. (*Hedrick v. Borden Co.*, 100 Ill.App.2d 237, 241 N.E.2d 546 (1968).) The record is devoid of anything that would indicate that the jury was acting out of passion and prejudice and the evidence supports the amount awarded to Ronald Larson.

The final contention of the defendant in this appeal is that the trial court erred in granting the counter-defendant's, General Motors, motion for a directed verdict. The defendant maintains that the evidence produced at trial was sufficient to prove a prima facie case on his counterclaim. The position of the defendant on this issue is best stated by quoting from his brief.

> "Drive shafts are not supposed to fall out after two years and four months of use involving approximately 24,000 miles. Indeed in the general experience of the motoring public the drive shaft never comes loose during the normal life of a car. Therefore the very fact that the drive shaft here dropped out after only 24,000 miles and two years and four months of use, makes a prima facie case under both the doctrine of implied warranty and strict liability."

The evidence adduced at trial showed that the defendant's vehicle was a 1964 Chevrolet Chevelle which had been purchased new from Z Frank

Chevrolet and manufactured by the counter-defendant, General Motors. At the time of the collision the defendant's vehicle was 28 months old and had 24,000 miles on it. The defendant testified that he had his automobile serviced regularly at Z Frank Chevrolet. The defendant also testified that repair work had been performed on his vehicle at two other locations. In February of 1966, the pin holding the shifting gear had broken and the vehicle was towed to Duck's Standard Service in Glenview, Illinois. The vehicle remained there for approximately 24 hours. The defendant testified that he was not present at the service station when the actual repairs took place and that he did not see what they did to his vehicle. In August of 1965, in Albany, New York, the defendant's vehicle began losing power and it was towed to a service station and it remained there for four or five days. The defendant testified that he had no first-hand knowledge as to what repairs were performed on his vehicle at this time. However, he did state that a piston in the motor was replaced. The defendant also testified that to his knowledge no repair work had been done to the drive shaft at the point where it connects to the rear axle. It should be noted that the defendant was not an automobile mechanic and had never had any courses in automobile mechanics. There were no records of any of the repair work introduced into evidence at the trial, nor did any of the mechanics who performed the work testify. We cannot agree with the defendant that the evidence adduced at trial was sufficient to prove a prima facie case on his counterclaim.

■■ The elements necessary to prove a prima facie case in strict products liability were set forth in the landmark case of *Suvada v. White Motor Co.*, 32 Ill.2d 612, 210 N.E.2d 182 (1965). The court there stated:

> "The plaintiffs must prove that their injury or damage resulted from a condition of the product, that the condition was an unreasonably dangerous one and that the condition existed at the time it left the manufacturer's control. See *Tiffin v. Great Atlantic and Pacific Tea Co.* 18 Ill.2d 48." *Suvada, supra,* at 623, at 188.

While the Illinois Supreme Court's decision in *Suvada* has been the subject of certain nuances, the requirement of proving that the unreasonable condition in the product had its genesis when the product was in the control of the manufacturer has not been relaxed. The defendant's proof failed in this material aspect.

■■ The defective condition which precipitates the unreasonably dangerous condition of the product need not manifest itself immediately. (*Dunham v. Vaughan & Bushnell Mfg. Co.*, 42 Ill.2d 339, 247 N.E.2d 428 (1969).) Indeed, this was implicit in our supreme court's decision in *Suvada*, since the defective brake in that case was installed in March

of 1957, but did not break until June of 1960. The *Dunham* case is also authority for the proposition that the extent of the normal useful life of a product is a question properly answered by the jury. It has also been held that a plaintiff, in proving the elements of a prima facie case in strict products liability, need not specify wherein the product is defective. In *Bollmeier v. Ford Motor Co.*, 130 Ill.App.2d 844, at 849, 265 N.E.2d 212, at 216 (1970), the court in referring to the specific language in *Suvada* which set forth the elements of a prima facie case in strict liability stated, "This language does not indicate that proof of the specific defect which causes the product to be in an unreasonably dangerous condition is necessary." The court went on to state at 851:

> "Therefore, direct or circumstantial evidence which tends to prove that the product failed to perform in the manner reasonably to be expected in the light of its nature and intended function, such as proof of a malfunction which tends to exclude other extrinsic causes, is sufficient to make a *prima facie* case on this issue."

While these cases have relaxed the burden of proof of a plaintiff in a strict products liability action and have made the theory a true strict liability doctrine as opposed to a modified negligence concept, the requirement of proving that the product was in a defective condition when it left the manufacturer's control remains a necessity.

■■■ The defendant contends that the very fact that the drive shaft fell out is sufficient to prove a prima facie case, but this is not the law. As stated in *Haas v. Buick Motor Division*, 20 Ill.App.2d 448, at 454, 156 N.E.2d 263 at 266 (1959):

> "The mere fact that an occurrence resulting in damage to property has happened does not authorize any presumption or inference that the defendant was at fault: *Rotche v. Buick Motor Co.* (1934) 358 Ill. 507; *Huff v. Illinois Cent. R. Co.* (1935) 362 Ill. 95. The mere fact that a fire evidently occurred here, resulting in damage to the property, does not authorize any presumption or inference that the defendant was responsible therefor,—the burden was on the plaintiff to prove, among other things, that there was some material defect in materials or workmanship: *Lindroth v. Walgreen Co.* et al. (1950) 407 Ill. 121. This is not a case for the application of some doctrine analogous to that of res ipsa loquitur: *Lindroth v. Walgreen Co.* et al. (1946) 329 Ill.App. 105; 28 Ill. L. and P. p. 180-195."

Although the complaint in *Haas* was based on a breach of express warranty and the decision was rendered prior to *Suvada,* the rationale of the court is equally applicable to a strict products liability action and in accordance with the *Suvada* decision. The mere fact that the drive shaft

fell out is not sufficient to draw the inference that the product was defective when it left General Motors' control. Similarly, the case at bar is not appropriate for the application of the doctrine of res ipsa loquitur since the automobile was not in the control of General Motors at the time of the occurrence.

There have been many actions brought in this jurisdiction on a strict products liability theory, but no decision has relaxed the plaintiff's burden of proof to the extent that it is no longer necessary to prove that the product was defective when it left the manufacturer's control. In *Taylor v. Carborundum Co.*, 107 Ill.App.2d 12, 246 N.E.2d 898 (1969), a strict products liability action, the defendant contended that the plaintiff had not proven an emery grinding wheel which broke was defective. However, the plaintiffs called as an expert witness a qualified chemist who testified as to the density of the wheel. He also testified that based on his tests it was his opinion that there was a causal relationship between the wheel's breaking and the variations he found in the wheel's density. In affirming a verdict in favor of the plaintiffs, the court stated, "* * * by means of expert testimony, direct proof of a defect in the product was adduced with the reasonable inference left to be drawn by the jury that it came into existence at the time of manufacture." (*Taylor, supra,* at 19; at 902.) In *Adams v. Ford Motor Co.*, 103 Ill.App.2d 356, 243 N.E.2d 843 (1968), the plaintiff brought an action in strict products liability against the defendant and on appeal the defendant maintained that the plaintiff had failed to prove the product had an unreasonably dangerous condition when it left the defendant's control. At the trial the plaintiff introduced a photograph of his truck which had been taken after the accident and it depicted that there were only five bolts fastening the cab to the chassis, while there were holes for six bolts. The plaintiff also produced a witness who testified that shortly after the truck was purchased he installed a trailer hitch and tow bar on the truck and at that time he found a bolt missing. Although the defendant introduced the testimony of the mechanic of the dealer who prepared the truck for delivery and who stated that all six bolts were present, the court held that the circumstantial evidence was sufficient to present a prima facie case. The court stated, "There is evidence from which the jury could draw the inference that the bolt was missing when the truck left defendant's control * * *." (*Adams, supra* at 359; at 845.) A plaintiff in a strict products liability action need not dispel all other possible causes of the defect in the product. (*Spotz v. Up-Right, Inc.*, 3 Ill.App.3d 1065, 280 N.E.2d 23 (1972).) The *Spotz* decision also involved a products liability case and on appeal the defendant contended that there was insufficient evidence of a defect in its product when it left defendant's con-

trol. The injuries in *Spotz* were sustained when a scaffold manufactured by the defendant fell outward. The scaffold was 15 years old at the time of the occurrence. The superintendent of the job on which the scaffold was being used testified that he inspected the defective claw clamp at the time of the occurrence and stated, "I don't see any place where it's been welded together." He also testified, "About the weld or welds, as to that claw and that rod at that time, it was obvious to me that the weld didn't hold, otherwise you couldn't have pulled the claw out." (*Spotz, supra,* at 1068-1069; at 25.) The plaintiff's expert testified that the claw clamp had not been welded to the tube. In affirming a judgment for the plaintiff the court stated:

> "Although the defendant mentions four possible causes for the scaffold collapsing in this case, it was not incumbent upon the plaintiff to disprove all other possible causes. Other possible causes cannot be excluded with certainty, but where there is sufficient evidence based upon the testimony of several witnesses to substantiate the claimed cause of the collapse of the scaffold, a jury question is presented as it is only necessary that the conclusion arrived at by the jury be based on an inference that is, itself, reasonable under the facts. (*Foster v. Union Starch & Refining Co.,* 11 Ill.App.2d 346.) * * *
>
> * * * While there is some evidence of misuse and/or abuse in the record, there is direct and positive testimony as to the collapse of the scaffold having been caused by the failure to weld the claw to the tube during the manufacturing process and before the product left the manufacturer. There is no complete absence of probative facts * * *." *Spotz, supra,* at 1072-1073; at 28.

It is, therefore, evident that while a defect in the product need not manifest itself immediately; the specific defect need not be proven; the question of the normal useful life of a product is properly determined by a jury; and a plaintiff need not disprove other possible causes of the defect, it is still a necessity to produce either direct or circumstantial evidence that would allow the jury to draw the reasonable inference that the defect in the product existed at the time the product left the manufacturer's control. Unlike *Spotz,* in the case at bar there is a complete absence of probative facts upon which a jury could base a reasonable inference that the drive shaft was defective when it left General Motors' control.

The defendant cited several cases in support of his proposition that the drive shaft falling out was sufficient in itself to prove a prima facie case. However, they can all be distinguished on the ground that there was direct or circumstantial evidence presented upon which the jury could

draw the reasonable inference that the product in question was defective when it left the manufacturer's control. (See *Lindroth v. Walgreen Co.*, 407 Ill. 121, 94 N.E.2d 847 (1950);[1] *Drewick v. Interstate Terminals, Inc.*, 42 Ill.2d 345, 247 N.E.2d 877 (1969);[2] *Dunham v. Vaughan & Bushnell Mfg. Co.*, 42 Ill.2d 339, 247 N.E.2d 401 (1969); *Bollmeier v. Ford Motor Co.*, 130 Ill.App.2d 844, 265 N.E.2d 212 (1970); *Alman Brothers Farms and Feedmill, Inc. v. Diamond Laboratories, Inc.*, 437 F.2d 1295 (1971); *Burchill v. Kearney National Corp., Inc.*, 468 F.2d 384 (1972); *Saboloff v. Yamaha*, 273 A.2d 606 (1971.) The defendant relied most heavily on the *Bollmeier* case and stated that it was most closely in point. However, as stated previously, the specified issue presented in that case was whether or not a plaintiff in a strict products liability action had to specify wherein the product was defective and the court held this was not necessary. However, in *Bollmeier* there was direct and circumstantial evidence from which the jury could reasonably infer that the automobile in question was defective when it left the defendant's control. A vibration in the steering column had been experienced from the date the plaintiff in *Bollmeier* took delivery of the automobile. In contradiction to the cases cited by defendant the case at bar is devoid of any probative facts which would indicate that his automobile was defective when it left the control of General Motors.

■■■ When we apply the *Pedrick* standard to the instant case, we cannot conclude that the trial court erred in directing a verdict in favor of General Motors. To hold that the falling out of the drive shaft itself was sufficient to prove a prima facie case would make General Motors an insurer of its product and be opposed to the holding in the landmark case of *Suvada v. White Motor Co., supra*. As started in *Zoerner v. Eisner Grocery Co.*, 111 Ill.App.2d 342, at 344, 250 N.E.2d 156 at 158 (1969):

> "Strict liability in tort was originally imposed upon those in the manufacturing and distribution chain to protect ordinary users and consumers from physical harm caused by a defective condition in a product making it unreasonably dangerous to the consumer. It is *not*, contrary to what it is sometimes called, a doctrine of absolute liability entitling any person harmed in using a product

---

[1] The *Lindroth* case was not a strict products liability decision but the complaints there charged the defendants with negligence and breach of warranty. In fact the decision in *Lindroth* was rendered 15 years before the doctrine of strict products liability was adopted in this jurisdiction.

[2] The *Drewick* case was also based on ordinary negligence and not strict products liability. The sole issue on appeal was whether the trial court had erred in submitting the case to the jury on a res ipsa locquitur theory.

to recover from any member of the production and distribution group. It does *not* make a manufacturer, distributor, or retailer an insurer of the consumer's safety. It *is* liability without negligence, but it is *not* liability without fault."

A jury cannot be allowed to predicate its verdict on mere conjecture or surmise.

"The burden of proof was upon the plaintiff to show that the disc [here the drive shaft] was unfit for its intended purpose when purchased from the manufacturer. 'The test to be applied was whether the circumstances shown were such as to justify an inference of probability as distinguished from mere possibility.' *Simon v. Graham Bakery, supra,* 17 N.J. at p. 531." *Jakubowski v. Minnesota Mining & Manufacturing,* 42 N.J. 177, at 184; 199 A.2d 826, at 830 (1964).

The defendant failed to sustain the burden of proof on his counterclaim against General Motors and it was therefore not error to direct a verdict against the defendant.

For the reasons herein stated, the judgment of the Circuit Court of Cook County is affirmed.

Judgment affirmed.

BURMAN and DIERINGER, JJ., concur.