**C. L. POUNCEY, Plaintiff-Appellee,**

v.

**FORD MOTOR COMPANY, Defendant-Appellant.**

**No. 71-2915.**

United States Court of Appeals,
Fifth Circuit.

Aug. 3, 1972.

Rehearing Denied Aug. 29, 1972.

John R. Matthews, Jr., Montgomery, Ala., for defendant-appellant.

Joseph D. Phelps, Montgomery, Ala., for plaintiff-appellee.

Before RIVES, BELL and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

C. L. Pouncey, the appellee, was injured while putting antifreeze in his 1966 Ford automobile. While he was ac-

celerating the engine with the hood open, a blade broke off the radiator fan, cut through the water hose, and struck him in the face causing permanent facial disfigurement. Pouncey had purchased the car secondhand approximately six months before the accident from Clement Motor Company of Greenville, Alabama. The car had been driven approximately 62,000 miles at the time of the accident.

Pouncey brought this action below against Ford Motor Company, the appellant, seeking damages for the injury on a products liability theory. The case was tried to a jury which returned a verdict in favor of Pouncey in the amount of $15,000.00. Ford now appeals from the denial by the district court of motions for a directed verdict, and for a judgment notwithstanding the verdict, or in the alternative for a new trial. The main thrust of Ford's appeal is that the evidence was insufficient to support the jury's verdict. Ford also assigns as error certain portions of the court's charge and certain evidentiary rulings. We conclude that all of these contentions are without merit and affirm the judgment of the district court.

## I.

As is frequently the case in products liability litigation, the trial produced a conflict in expert testimony. The main thrust of Pouncey's case was that the fan blade failure occurred because of a fatigue fracture in the metal fan blade. It was Pouncey's theory that the premature fatigue failure was caused by an excessive number of inclusions in the metal of the blade. An inclusion is a non-metallic impurity in the steel which weakens the metal.

To substantiate this theory, Pouncey called Dr. C. H. T. Wilkins, a metallurgical engineer, as an expert witness. Dr. Wilkins testified that he cut and mounted a specimen of metal from the failed blade. He also cut and mounted specimens from a blade which had not failed and from another Ford fan blade which had failed. On microscopic examination of this mount, Dr. Wilkins found a "surprising number of inclusions" which he did not expect to find in this type steel. These inclusions, he testified, were an identifiable defect in the metal which served as "stress concentrating areas" and "lowered the endurance limit of the fan".

Dr. Wilkins also testified concerning certain bends and deformations in the blade. He conceded that there appeared to be some bends in the blades but he expressed the opinion that the blade which actually failed was not bent. In his opinion, the bends in the blades were not the cause of the fatigue failure.

Not surprisingly, Ford's expert witnesses took a different view of the facts. Ford first called Dr. Robert Hochman, another metallurgical engineer. Dr. Hochman testified that he received and examined the metal specimen that had been mounted by Dr. Wilkins. It was his opinion that the specimen had been mounted in such a way that acid seeped into the cracks between the specimens of metal, causing an exaggerated appearance of large inclusions, Dr. Hochman remounted and polished the specimens and took photomicrographs of them. These photomicrographs showed an acceptable inclusion level, testified Dr. Hochman, which conformed with standards established by the Society of Automotive Engineers.

Dr. Hochman attributed the fracture to a different source. He testified that one arm of the blade was bent and that this would have a major effect in throwing the fan out of balance. He also noted that the ends of the blades were bent and cracked and that this condition would also tend to imbalance the fan. An out-of-balance condition, Dr. Hochman testified, could cause the blade to vibrate and set up a high stress pattern which would result in the acceleration of metal fatigue. Dr. Hochman also noted a small notch in the fracture surface which could have been attributed to impact damage.

Ford also called two other expert witnesses, both of whom were Ford employees. Mr. Phillip Burch, a Ford design engineer, testified as to the testing procedures utilized by Ford on newly designed radiator fans. Mr. Robert Riding, another Ford engineer, testified concerning alleged bends in the fan blades. He stated in his opinion that the fan failed because of an unbalanced condition in the fan which may have been caused by a front end collision or by rough handling.

## II.

■ Ford contends that the district court erred in refusing to grant its motion for judgment notwithstanding the verdict. We conclude, however, that applying the standard of Boeing Company v. Shipman, 5 Cir. 1969, 411 F.2d 365, the evidence was sufficient to take the case to the jury.

Initially, Ford argues that the evidence was insufficient because Pouncey's expert testimony, viewed in its best light, does not make any one cause of the blade separation more probable than another. Ford places special emphasis on one portion of the record in which it is said that Dr. Wilkins declined to state that the level of inclusions which he found in the metal was unacceptable. The testimony in question is as follows:

"Q. From what you yourself saw, Doctor, of the inclusions that were in this radiator fan, Exhibit No. 1, that struck Mr. Pouncey, was that an acceptable level of inclusion in that material?

"A. In the sense that I found the number of inclusions that I did, sir, I was very much surprised.

"Q. You were surprised when you saw all that in there?

"MR. MATTHEWS: If the Court please, we move to exclude that answer. That is not what was asked. He said he was surprised. The question was whether it was accept—

"MR. MANCUSO: Why—

"THE COURT: Excuse me. Wait just a minute.

"MR. MATTHEWS: Whether it was an acceptable level of inclusion.

"THE COURT: I think it is appropriate if you can see if you can answer that question, whether it was an acceptable level of inclusion. Can you give an answer to it?

"A. No, sir. Because I do not know what they consider an acceptable level."

It is further contended that Dr. Wilkins' testimony as to the cause of the separation was speculative. Ford asserts that Dr. Wilkins merely stated that the inclusions "could" have caused the fatigue fracture and that he acknowledged that it might have been caused by imbalance of the blades or by other factors such as sludge build-up.

However, a careful reading of Dr. Wilkins' testimony in its entirety requires that we reject Ford's contentions. His testimony went far beyond mere speculation in pinpointing the cause of the fracture. He stated unequivocally that "enormous" inclusions not normally found in spring steel were an "identifiable defect" in the metal which caused premature fatigue failure.[1] Ford's as-

---

1. A sampling of Dr. Wilkins' testimony is as follows:

"Q. Is it true the presence of these substances, these foreign substances in metal premature, shorten the life of the metal?

A. Yes, sir, it can.

Q. Were these inclusions present and were they an identifiable defect in this particular radiator fan that has been marked as Exhibit No. 1 at the time the thing was installed on the automobile?

A. Yes, sir.

&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;

Q. But they [inclusions] were present in the metal?

A. Yes, sir. And should have been seen at an earlier time.

Q. Could they have been seen at an earlier time?

A. Yes, sir.

sertion that Dr. Wilkins refused to state that the level of inclusions which he found was "unacceptable" is unfounded. That refusal was merely based on his hesitancy to ascribe the label "unacceptable" to the level of inclusions which he found while not knowing how his questioner defined the term. As Dr. Wilkins stated, he declined to answer the question "[b]ecause I do not know what they consider an acceptable level".

Ford also contends that the evidence was insufficient to support an inference of negligence either on the part of Ford or Ford's supplier, Fram Corporation.[2] Ford contends that the testimony is undisputed that even under the best quality control program there is always the

Q. If Ford, Dr. Wilkins, had the proper quality control tests run on that metal, would they have discovered that?

MR. MATTHEWS: Objection to the question, leads to conclusions on the jury.

THE COURT: I will sustain.

Q. Dr. Wilkins, with steel which is as you have testified, as dirty as what you saw, could they have reasonably expected this blade to have failed?

MR. MATTHEWS: Objection to the form of the question.

THE COURT: Overrule.

A. Yes, sir.

Q. All right. Now, Doctor, is it true that the presence of these inclusions would lower the endurance limit of this metal from what it would have been had not the inclusions been present in the metal?

A. Yes, sir.

Q. Now does this mean that the blade would break prematurely, and by prematurely I'm referring to what you would normally expect the length of the life of the blade to be?

MR. MATTHEWS: Objection.

THE COURT: Overruled.

A. Yes, sir.

Q. It would break prematurely with these type—

A. With respect to what might be considered normal life.

Q. Now, Doctor, is it true that the presence of these inclusions or these foreign substances or dirty matters, however you want to refer to it, would shorten the fatigue life of the metal in this particular Exhibit No. 1 that we are talking about from what you would expect it to be if it didn't have this matter in it?

A. Yes, sir.

* * * * *

Q. Did these inclusions constitute a stress concentrating area?

A. Yes, sir.

Q. All right. What are we referring to there?

A. When you apply a bending stress to a metal, and if an inclusion is located in a highly stressed area, particularly if it is in near the edge, which of course would be highly stressed, then you can have the stress itself concentrated in that particular area. And eventually have this develop into possibly a notch, which could lead into a fracture.

Q. Doctor, if everything you have testified to, does it have a bearing on what actually happened in this blade that struck Mr. Pouncey?

A. Yes, sir.

Q. Now, Doctor, is it true, with regard to these stress concentrated areas, that they did lower the endurance limit of this particular piece of metal that injured Mr. Pouncey from what it would have been had the inclusions or the stress concentrating areas not been in there?

A. Yes, sir.

Q. All right. And again would these— would the absence or it is true that the presence of these stress concentrating areas shorten the fatigue life of the metal from what it would have been had they not have been in there?

A. Yes sir.

* * * * *

Q. You found inclusions in this metal that struck Mr. Pouncey, is that correct?

A. Yes, sir.

Q. All right.

A. We found inclusions, and I might emphasize here, it is not merely a matter of finding inclusions. I think it is the number of them, and the distribution of them enters into it."

* * * * *

2. Alabama has explicitly adopted § 400 of the Restatement of the Law of Torts (2nd) which provides as follows:

One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer.

Sears, Roebuck & Company v. Morris, 273 Ala. 218, 136 So.2d 883, 885 (1962). Thus, Ford is vicariously liable for any negligence of its supplier, Fram Corporation.

possibility that isolated pockets of inclusions could be found in metal and that there is no practical means of discovering the particular fans which might have these impurities. Ford argues that the absence of any proof by Pouncey of inadequate quality control procedures on the part of Ford or its supplier bars submission of the issue of Ford's negligence to the jury. Again we disagree.

■■ In this diversity action, federal law, of course, defines the test for sufficiency of evidence to create a jury question. Boeing Company v. Shipman, supra. But the law of Alabama governs the substantive measure of care owed by the manufacturer of a product to the ultimate consumer. Under Alabama law, it is settled that a manufacturer's liability for a defective product is predicated upon negligence in the manufacture or design of the product. See e. g. Ford Motor Company v. Thomas, 285 Ala. 214, 231 So.2d 88. However, the Alabama courts have freely permitted juries to infer manufacturer negligence from circumstantial evidence where there is in the record direct evidence of an actual defect in the product. For example, in Greyhound Corporation v. Brown, 269 Ala. 520, 113 So.2d 916 (1959), the plaintiff had been injured while riding in a bus when a tire manufactured by the defendant blew out. In an action against the manufacturer, the plaintiff produced expert testimony that the blowout was due to a defect in the tire, but there was apparently no evidence as to the quality control procedures employed by the manufacturer. The court permitted the jury to infer negligence from the direct evidence of the defect in the product. Similarly, in Sears, Roebuck & Company v. Morris, 273 Ala. 218, 136 So.2d 883, the court permitted a jury to infer negligence in the manufacturer of a wheel on a boat trailer based on expert testimony:

> by a chemical and metals engineer who personally made an analysis of the metals in the wheel in question and determined their respective tensile strengths. He testified directly that the bursting of the wheel * * * was caused by "First, it is poor metal and second poor design. * * * It is defective in design * * * it is a dangerous wheel * * *."

Ford Motor Company v. Thomas, 285 Ala. 214, 231 So.2d 88, 92 (1970). See also Norton Company v. Harrelson, 278 Ala. 85, 176 So.2d 18 (1965); Harnischfeger Corporation v. Harris, 280 Ala. 93, 190 So.2d 286 (1966).

In the case at bar, there was direct evidence that Ford's supplier manufactured the blades with "dirty" spring steel. There is also testimony by Pouncey's expert that Ford and its supplier could reasonably expect a premature fatigue failure from steel with that level of inclusions. Finally, Ford itself offered no evidence as to the quality control procedures actually employed with regard to the radiator fans produced in 1966.[3] The court below committed no error in permitting the jury to infer from this evidence negligence on the part of Ford in placing on the market a defective radiator fan which could reasonably have been expected to produce injury or damage.

In summary, Pouncey produced expert testimony that a defect in the steel used to construct the fan was the proximate cause of the accident. In addition, he offered evidence that negated Ford's contentions that the failure was due to deformations in the blade which, in turn, were caused by a front-end collision. Ford joined issue based on its own experts' testimony that the level of inclusions was acceptable and that the fracture was caused by imbalance in the blades. As this court has previously observed:

> It is not our function to determine which side has produced the heavier

---

3. The testimony of Ford design engineer Phillip Burch dealt almost exclusively with the testing of newly designed fans. Burch could offer virtually no information on the tests *actually* conducted on the 1966 production fans.

evidence. Once the court has determined that the plaintiff has brought forward sufficient evidence to warrant jury submission, it then becomes the function of the jury to strike the balance between the parties.

Ford Motor Company v. Mathis, 5 Cir. 1963, 322 F.2d 267. The disputed evidence as to the cause of the blade fracture was such that reasonable men might reach different conclusions. The court properly denied the motions for directed verdict and for judgment notwithstanding the verdict. Boeing Company v. Shipman, 5 Cir. 1969, 411 F.2d 365.

### III.

Ford has raised numerous contentions concerning the court's charge and certain evidentiary rulings by the court. We have carefully considered these contentions and conclude that they are without merit.

Affirmed.