31 Ill. App.3d 217 (1975)
334 N.E.2d 764
HORACE G. ROCKETT, Plaintiff-Appellant,
v.
CHEVROLET MOTOR DIVISION, GENERAL MOTORS CORPORATION, Defendant-Appellee.
No. 59743.
Illinois Appellate Court  First District (4th Division).
July 23, 1975.
Rehearing denied September 10, 1975.
McCoy, Ming & Black, of Chicago (Ellis E. Reid, John W. Hatch, and Sidney A. Jones III, of counsel), for appellant.
Forrest L. Tozer and Michael Davis, both of Chicago (R.R. McMahan, John J. Berwanger, Lord, Bissell & Brook, and Frazer F. Hilder, of counsel), for appellee.
Judgment affirmed.
*218 Mr. JUSTICE BURMAN delivered the opinion of the court.
This is an action brought by plaintiff, Horace G. Rockett, for personal injuries suffered when the Chevrolet Truck in which he was a passenger left the highway and overturned. Plaintiff claims that the 4-year-old vehicle had been defectively manufactured by defendant, General Motors, and that such defects were the proximate cause of the accident. At the close of plaintiff's case, the trial court granted defendant's motion for a directed verdict and entered judgment accordingly. Plaintiff appeals.
Plaintiff contends that (1) the trial court erred in granting defendant's motion for a directed verdict and (2) the cause should be reversed and remanded for a new trial with instructions that certain evidence offered at trial by plaintiff and denied by the court be admitted into evidence. The nature of the issues before us necessitates a detailed discussion of the evidence adduced at trial.
On May 22, 1966, plaintiff was severely injured while riding as a passenger in a 1962 Chevrolet Model C 1404 half-ton pickup truck. The injuries occurred when the truck left the highway and overturned on Route 66 outside of Dwight, Illinois. Plaintiff's employer, South Suburban Safeway Lines, had purchased the subject truck from defendant on April 20, 1962. The purchase order called for the installation of heavy-duty rear springs. At the time of the accident, the truck was 4 years old and had been driven approximately 61,000 miles.
The circumstances of the accident were testified to by plaintiff, a State trooper who investigated the accident scene, and Roland Maerz, the driver of the vehicle. The accident occurred at about 1:40 p.m. on a clear, sunny, dry day; however, it was an extremely windy day with wind gusts up to 45 miles per hour. At the direction of their employer, Maerz and plaintiff were driving south from Chicago to Bloomington, Illinois, to perform road service on a company bus disabled by two flat tires. Maerz testified that the greatest speed he attained during their journey was 55 miles per hour, although plaintiff stated that at one point in time he noticed the speedometer read 60 miles per hour. They had driven on Route 66 for 5 to 10 miles prior to the accident. At speeds in excess of 45 miles per hour Maerz did not like the control of the vehicle and so he would decelerate. He testified that strong gusty winds buffeted the truck, especially when large trucks passed in the opposite direction. The passing of a truck caused him to go off course about 3 feet to one side.
Just prior to the accident, Maerz was driving in the right-hand lane approximately 1 foot from the pavement edge. He estimated the vehicle's speed at no more that 45 miles per hour. At that location there was a 6-inch drop from the pavement to the highway shoulder. A large truck *219 passed them in the opposite direction, and immediately, thereafter, both right wheels of their truck left the roadway and dropped over the 6-inch ledge to the shoulder. Plaintiff's vehicle travelled 86 feet in this fashion before regaining the pavement. The truck then skidded left across the roadway, overturned, and came to a rest upside down in the median strip. A bus tire, which was being hauled unsecured in the truck bed, flew or fell from the truck during the accident and was found in a ditch along the right-hand side of the highway. Upon inspection of the vehicle it was further learned that both right tires came partially off their rims. At the time of the accident the truck was carrying weight just 30 pounds short of the maximum capacity of that model equipped with heavy duty springs.
Paul Madsen, purchasing agent for South Suburban Safeway Lines, testified that he purchased the subject truck new from George R. Gibson Chevrolet in South Holland, Illinois. He did not know whether the rear springs were installed by the dealer. Nor did he know whether the truck had been equipped with heavy-duty rear springs as ordered. Previously, he had not requested George Gibson Chevrolet to install springs on any of the other company vehicles. Madsen further testified that to his knowledge the subject truck had never been in an accident. If it had, he would have known because he would have purchased the necessary parts. The only changes made to the physical configuration of the truck were the installation of a hydraulic tailgate weighing between 400 and 500 pounds, and the placement of a sheet metal bottomer inside the truck box to facilitate the loading and unloading of salt. Madsen testified that he drove the truck in 1964, and that it steered smoothly like a pleasure car. To his knowledge the rear springs and shock absorbers had never been changed. Nor had a wheel alignment ever been performed. The truck had different tires than it had on the day of purchase, but they were of the same size. The company had no available facilities to check or reset casters. Madsen saw the truck in Dwight, Illinois, on the day after the accident.
Plaintiff claims that the subject truck was defective in two respects at the time it left defendant manufacturer's control and that the two defects, either independently or in concert, proximately caused his injury. He asserts that the vehicle was manufactured with grossly maladjusted front-wheel caster and that it had not been equipped with heavy-duty rear springs as ordered, but rather with much softer springs.
At the time of trial, the truck was not available to any of the parties. The record reveals that shortly after the accident, South Suburban Safeway Lines had it transported to Commercial Truck and Body Company where it remained undisturbed for approximately 3 months. Ultimately, *220 the vehicle was cut apart for salvage purposes and the relevant parts are now buried under 15 feet of landfill. Accordingly, plaintiff produced no direct evidence of the actual caster setting or of the rear springs with which the vehicle was equipped.
Plaintiff's conclusion that the truck had an improper caster setting was arrived at inferentially from Maerz' recollection of the steering and riding characteristics of the truck. Maerz was the sole witness to testify about the driving characteristics of the truck other than Paul Madsen who merely stated that it drove smoothly like a pleasure car. Maerz testified that he drove the truck shortly after its delivery and that its steering characteristics remained unchanged to the date of the accident. He observed that the truck was very sensitive to wind currents and that the passing of a large truck would cause it to move to one side or the other. Maerz testified that from his experience he found either no caster or a negative caster can cause this type of feel.
A test vehicle was constructed by plaintiff for experimental purposes from another 1962 model C 1404 Chevrolet half-ton truck and certain parts from a 1961 model C 1404 half-ton truck. Plaintiff contends that the model was an exact duplicate of the crash vehicle in all material respects except for its steering characteristics and the rear end suspension. Two of plaintiff's expert witnesses, Dr. Uzgiris and Mr. Smidl, determined that negative caster would have to be set onto the front wheels in order to achieve the sensation orally described by Maerz.
Maerz further testified that on several occasions he had operated a hydraulic lift that had been installed on the rear of the truck. He observed that the rear of the truck would drop 6 to 8 inches when using it to lift oil drums weighing from 385 to 410 pounds. Dr. Uzgiris interpreted this result to mean that heavy-duty springs could not have been installed in that vehicle because under the conditions described by Maerz, the rear springs would compress only about 2 inches. Dr. Uzgiris further testified that a soft suspension system would aggravate a problem caused by negative caster if a load were introduced into the bed of the truck.
Plaintiff contends that the trial court erred in directing a verdict for defendant. Consequently, we are concerned only with the narrow question of whether the evidence, when viewed in its aspect most favorable to plaintiff, so overwhelmingly favors defendant, that no contrary verdict based on that evidence could ever stand. Pedrick v. Peoria & Eastern R.R. Co., 37 Ill.2d 494.
 1 In Suvada v. White Motor Co., 32 Ill.2d 612, our supreme court articulated the elements necessary to prove a prima facie case in strict liability actions. Plaintiff must prove (1) that the injury or damage resulted from a condition of the product; (2) that the condition was an *221 unreasonably dangerous one; and (3) that the condition existed at the time it left the manufacturer's control. We emphasize that no direct testimony was introduced concerning the cause of the accident or the existence of the alleged defects. While it is true that a prima facie case may be established exclusively from circumstantial evidence, said evidence must have a reasonable probative force, for the jury will not be permitted to engage in mere speculation or imagination. (Shramek v. General Motors Corp., 69 Ill. App.2d 72, 216 N.E.2d 244.) Accordingly, unless it can be said that the evidence at bar gives rise to a reasonable inference that the injury resulted from a condition of the product, that the condition was an unreasonably dangerous one, and that the condition existed at the time it left defendant's control, then the case should have been removed from the jury's consideration. See Larson v. Thomashow, 17 Ill. App.3d 208, 307 N.E.2d 707.
There is evidence in the record to suggest that a negative caster setting and soft rear suspension are in fact dangerous conditions, and consequently, a directed verdict cannot be justified for failure of proof in this regard. However, this is only one of three elements as articulated in Suvada. Assuming for the moment, but not admitting, that the evidence also supports a conclusion that the truck was defective at the time it left defendant's control, plaintiff must still prove that the defect actually caused his injury. In other words, its must be a reasonable inference that Maerz lost control of the truck because the vehicle was not equipped with heavy-duty rear springs and/or had an improper caster setting. The evidence simply does not warrant such an inference.
The question of proximate cause is a question of fact the determination of which must have some reasonable basis in the evidence. This is not a case where the accident itself would suggest a defective product. Nor is this a case where a failure or malfunction of a product is clearly involved. As we stated the truck was over 4 years old and had been driven in excess of 61,000 miles at the time of the accident. Little was known of the actual use or misuse of the vehicle since the man who usually drove the truck died prior to trial. The accident occurred on an extremely windy day, so gusty in fact that the State trooper who investigated the accident testified that he experienced difficulty keeping his own car on the road. Maerz stated that at the time of the accident he was driving 45 miles per hour and was hauling a payload just short of the maximum for a truck of that model equipped with heavy-duty springs. When the accident occurred he said it felt like a blowout and acknowledged that a sudden loss of air in one of the right tires could have caused the accident. In fact, Maerz testified that after the accident, he found both right tires were flat and partially off the rims. The cargo itself was *222 not secured or restrained in any way, and one of the large mounted bus tires, weighing at least 235 pounds, was found on the side of the road where the right wheels initially left the pavement.
Thus, all of these factors, a 4-year-old truck that had been driven 61,000 miles, a heavy load, a shifting of that load, high wind, a 6-inch ledge from the shoulder to the pavement, and a sudden loss of air in the tires are all possible causes of the accident. We further note that Maerz returned the truck to the pavement without any significant reduction of speed. This too could have caused the accident as well as other possibilities of driver error.
 2 It is true that plaintiff need not disprove all other possible causes. (Spotz v. Up-Right, Inc., 3 Ill. App.3d 1065, 280 N.E.2d 23.) It is equally true, however, that a jury may not engage in mere speculation and conjecture. (Shramek v. General Motors Corp., 69 Ill. App.2d 72, 216 N.E.2d 244.) In order to submit a case to the jury there must be a quantum of evidence sufficient to give rise to a reasonable inference that the asserted fact is true, for to arrive at that conclusion on a lesser factual basis necessarily would require sheer speculation. In the case at bar there exist numerous equally possible causes of the accident, and to conclude that those asserted by plaintiff were the actual causes could only be accomplished through an exercise of gross guesswork. Thus, on the basis of the causation element alone, the trial court acted properly in granting a directed verdict and removing the case from the consideration of the jury.
We also believe that plaintiff failed to establish that the truck was defective at the time it left defendant's control. No direct evidence was produced to substantiate this allegation. The only testimony concerning the actual condition of the truck on the day of the accident was that of a mechanic who salvaged certain parts of the truck. He stated that nothing appeared to be wrong with either the front or rear suspension.
Plaintiff would have the jury infer that the alleged steering and riding characteristics of the truck were caused by extreme negative caster and soft rear suspension, and then further infer that these characteristics were present at the time of manufacture. We note that prior to the accident, no claim ever was made to defendant of any defect in the truck. This is true even though the truck had been serviced on many occasions. Plaintiff's conclusion that defendant maladjusted the front-wheel caster of the truck was arrived at inferentially from Maerz' recollection of the feel of the truck 1 week after its purchase in 1962, and its feel 4 years later on the date of the accident. Maerz testified that in his opinion "either no caster or a negative caster alignment can cause this type of *223 feel." There was no evidence that the truck actually had a negative caster at the time of purchase.
Plaintiff's conclusion that the truck was equipped with soft rear springs was also arrived at inferentially from Maerz' recollection of the feel of the truck which, in his opinion, indicated soft springs, and from his observation that the rear of the truck would drop 6 to 8 inches when the hydraulic lift was used to raise oil drums. This observation was used as the basis for an opinion by an automotive design expert that heavy-duty springs could not have been installed on the subject truck. Maerz never measured the drop of the truck, and the 6- to 8-inch figure is only his estimation. Furthermore, Dr. Uzgiris stated that a 6- to 8-inch drop of the rear of the truck does not constitute a similar deflection in the rear springs. Dr. Uzgiris admitted that the spring deflection would be substantially less, but was unable to calculate the actual deflection.
Plaintiff has piled inference upon inference; and logic would dictate that the more remote the inference, the more enfeebled is its probative force. We hold there is no evidence in the record, either direct or circumstantial, from which a jury reasonably could conclude that a condition of negative caster and/or soft springs existed at the time the truck left the control of defendant manufacturer. To so conclude would require sheer speculation and conjecture. While the granting of a directed verdict is indeed a delicate matter, precedent reveals that even stronger cases have been taken from the jury.
In Shramek v. General Motors Corp., 69 Ill. App.2d 72, 216 N.E.2d 244, a grant of summary judgment for defendant manufacturer was affirmed on appeal. Plaintiff claimed that the blowout of a left rear tire caused the car in which he was riding to leave the highway and overturn. Plaintiff admitted that he could not produce the tire and that he had no knowledge of its continued existence. The tire was never subjected to an examination which would establish the preexisting defect as the cause of the blowout. The court held that without any examination of the tire to elicit the cause of the blowout, plaintiff could not prove, either directly or inferentially, a case of negligence, breach of warranty or strict liability. The court stated that blowouts could be attributed to a myriad of causes, and the determination of why the tire blew out could be left only to speculation.
In Larson v. Thomashow, 17 Ill. App.3d 208, 307 N.E.2d 707, there was no question that the failure of a product caused an accident. The drive shaft fell out of a 28-month-old vehicle that had been driven only 24,000 miles. We held there that the mere fact the drive shaft fell out was not sufficient to draw the inference that the product was defective when it *224 left the control of the manufacturer. We upheld a directed verdict for defendant manufacturer.
In Briner v. General Motors Corp. (Ky. 1970), 461 S.W.2d 99, plaintiff brought suit against Universal Chevrolet and General Motors alleging that her injuries were caused by a mechanical defect in the steering system of her car that existed at the time of sale and that was improperly repaired by the leader. A directed verdict was entered in favor of Universal, and the jury returned a verdict for General Motors. There plaintiff brought the car to Universal complaining that "it was pulling and galloping and there was vibration in it." Seven months later she wrote to General Motors and complained of vibration and lack of speed. Universal found and corrected a maladjustment of the air pressure in the front tires. Universal further discovered that the air conditioning compressor was a cause of vibration and it was replaced. In August, 1964, road tests were conducted by Universal, but they were unable to find anything wrong. At the time of the accident in March, 1965, the car had been driven over 25,000 miles. At trial General Motors introduced evidence that there was no mechanical breakdown in the steering system. Plaintiff produced no direct evidence of a defective mechanical condition, but rather attempted to prove the defect solely through circumstantial evidence. She introduced the testimony of two expert witnesses who, in response to hypothetical questions, stated that abnormal vibration in an automobile, which could be caused by misalignment and other specified defects, could affect the steering mechanism. The accident occurred 7 months and 9000 miles after Universal had serviced the car. As in the instant case, plaintiff did not complain to the dealer about the improper operation of the vehicle. The court agreed with plaintiff's contention that a casual relationship could be established by circumstantial evidence, but it held that the law requires that more than a possibility exist. The court stated:
"While reasonable inferences are permissible, a jury verdict must be based on something other than speculation, supposition or surmise."
The court concluded that "considering the length of time that elapsed after Universal's last servicing of the automobile, the mileage driven, the uncertain character of the cause of the accident, we are too far out in the realm of conjecture to have a proven case of liability. There were just too many possible causes other than a mechanical defect attributable to Universal's negligence." The court went on to say that what was said about plaintiff's claim against Universal applied equally, if not more so, to General Motors.
*225 Plaintiff also urges that the failure of General Motors to produce the accident vehicle which was available to it gives rise to a presumption that an examination of the vehicle would produce evidence harmful to the defense. There is no merit to this claim. The vehicle was taken by South Suburban Safeway Lines, Inc., plaintiff's employer, to Commercial Truck and Body Company where it remained and was subsequently destroyed as being a total economic loss. The defendant did not own, possess or control the truck or any part of it.
Plaintiff also urges that the trial court abused its discretion in refusing to admit evidence of experiments conducted with a test vehicle. Apparently, the vehicle was employed by plaintiff's experts for the dual purpose of reproducing the "steering feel" of the accident vehicle as orally described by Maerz and of observing the effect of loads on its heavy-duty springs. Plaintiff contends that the test vehicle was identical to the crash vehicle in all material respects, and that any dissimilarities go to the weight of the evidence and not to its admissibility, citing Ramseyer v. General Motors Corp. (8th Cir.1969), 417 F.2d 859. As stated in Ramseyer, perfect identity between experimental and actual conditions is not required. However, that case also recognizes a threshold issue well established in Illinois: Has there been a foundational showing of substantial similarity between the tests conducted and actual conditions? Absent such a showing the evidence is incompetent.
 3 We note from the outset that the decision of whether to admit or exclude evidence of experiments rests largely in the sound discretion of the trial judge, and his determination will not be overturned on appeal absent a clear showing of abuse of discretion. (Sherman v. City of Springfield, 77 Ill. App.2d 195, 222 N.E.2d 62.) In the instant case the record discloses numerous material dissimilarities between the test model and actual conditions, and accordingly, we can find no abuse of discretion by the trial judge in excluding the evidence. For example, the test model did not have a 450-pound hydraulic tailgate hanging from its extreme rear. It had an 8-cylinder engine while the truck had a 6-cylinder engine. It had new shock absorbers, rather than those of a truck that had been driven 61,000 miles in commercial service hauling. It had the same type of tires as those on the accident vehicle, but of course, their mileage differed. No similarity to the steering system of the accident vehicle was shown. Finally, there were many inaccuracies in the reconstruction of road conditions as they existed on the day of the accident. The discrepancies were not slight and only tended to build up inferences upon inferences that there was a causal relationship between the alleged defects and plaintiff's injuries. Inasmuch as there was no showing of essential *226 similarity between the test conditions and the conditions as they existed at the time of the accident, we hold that the trial court did not err in refusing the evidence.
Other errors are alleged with regard to the court's refusal of certain evidence. We have carefully examined the record and find that said evidence was properly excluded as being irrelevant. The trial court did not abuse its discretion.
In sum, plaintiff was unable to present prima facie proof that the accident was caused by a dangerous condition of the truck that existed at the time it left the control of defendant. The trial court properly directed a verdict for the defendant.
We therefore affirm the judgment.
Judgment affirmed.
ADESKO, J., concurs.
Mr. JUSTICE JOHNSON, dissenting:
I agree with the opinion of the majority that the evidence presented by plaintiff suggests that a negative caster and soft rear suspension are in fact dangerous conditions. I am of the opinion, however, that the unrebutted evidence proffered by plaintiff was sufficient to raise a jury question on the other two elements necessary for a prima facie case of strict products liability under Suvada v. White Motor Co. (1965), 32 Ill.2d 612, 210 N.E.2d 182  namely, that the allegedly unreasonably dangerous condition of the truck existed when it left the control of the manufacturer, and that the defect was the cause of plaintiff's injuries. Therefore, I respectfully dissent from the opinion of the majority.
The rule to be applied by a trial judge in a case heard before a jury was enunciated thusly by our supreme court in Pedrick v. Peoria & Eastern R.R. Co. (1967), 37 Ill.2d 494, 229 N.E.2d 504, 513:
"[V]erdicts ought to be directed and judgments n.o.v. entered only in those cases in which all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand."
Applying the Pedrick rule to the facts in this case, I do not believe that the directed verdict was proper.
To support his theory that an unreasonably dangerous condition existed when the truck left the manufacturer's control, plaintiff attempted to offer into evidence a test vehicle made from another 1962 Model C 1404 half-ton truck. The trial court refused to allow the jury to hear testimony *227 concerning this test vehicle. In my opinion, this exclusion was prejudicial error.
Admissibility of the evidence proffered here depends upon a foundational showing that there is substantial similarity between the tests and the actual conditions. (Thomas v. Chicago Transit Authority (1969), 115 Ill. App.2d 476, 253 N.E.2d 492.) Perfect identity between experimental and actual conditions is neither attainable, nor required, and dissimilarities affect the weight of the evidence rather than its admissibility. See Ramseyer v. General Motors Corp. (8th Cir.1969), 417 F.2d 859; Lever Brothers Co. v. Atlas Assurance Co. (7th Cir.1942), 131 F.2d 770.
In this case, plaintiff offered to show that the actual vehicle was unchanged in all material respects from the time of its purchase to the date of the accident. His expert witness, an automotive design specialist, stated outside the presence of the jury that the composition of the actual crash vehicle was ascertainable from the purchase invoice, serial number, and manuals prepared by the defendant. Plaintiff's expert further explained that the duplication of the actual vehicle had been identical and exact in all respects material to handling characteristics, and that the duplicate truck had the same front end assembly, steering mechanisms, suspension system, and curb load as that of the actual crash vehicle. By virtue of the directed verdict, defendant was not required to introduce any evidence as to how the test vehicle differed from the actual truck if, in fact, there was a substantial difference.
In Sherman v. City of Springfield (1966), 77 Ill. App.2d 195, 222 N.E.2d 62, we held that the exclusion of plaintiff's exhibit consisting of a pipe and reducer unit which was nearly identical to that involved in the accident was error where the actual pipe and reducer unit was unavailable. In Ramseyer v. General Motors Corp. (8th Cir.1969), 417 F.2d 859, the results of tests performed upon a set of gears which was substantially similar to an allegedly defective set of gears were admitted even though the test gears had never been subjected to road conditions. The court held that it was proper for the jury to consider the evidence of the experiments for whatever worth it had.
The majority cites Larson v. Thomashow (1974), 17 Ill. App.3d 208, 307 N.E.2d 707, a case in which plaintiffs contended that the mere fact the drive shaft fell out of a vehicle was sufficient to draw the inference that the product was defective when it left the control of the manufacturer, and we affirmed a directed verdict for the defendant. However, Larson is unlike the case at bar. Here, plaintiff did not attempt to rely upon the doctrine of res ipsa loquitur but offered circumstantial evidence to support his position, thereby following our holding in Larson that it was necessary in a strict products liability case to produce either direct or *228 circumstantial evidence that would allow the jury to draw a reasonable inference that the defect in the product existed at the time it left the manufacturer's control.
Further, we noted in Larson a relaxation of the burden of proof of a plaintiff in a strict products liability action and made the following observations that bear upon the age of the vehicle in this case: the defect which precipitates the unreasonably dangerous condition of the product need not manifest itself immediately (Spotz v. Up-Right, Inc. (1972), 3 Ill. App.3d 1065, 280 N.E.2d 23), and the question of the normal useful life of a product is properly determined by the jury. (Dunham v. Vaughn & Bushnell Mfg. Co. (1969), 42 Ill.2d 339, 247 N.E.2d 401.) In the instant case, these determinations were removed from the jury's consideration by the directed verdict which, I believe, was error.
Lastly, I belive that the trial court erred in preventing the jury from determining whether the alleged defect was the proximate cause of plaintiff's injuries. Defendant has argued that there are many possible causes of the accident involved here. However, as the majority notes, it is not incumbent upon a plaintiff in a strict products liability case to disprove all other possible causes of injury. Where there is sufficient evidence based upon the testimony of several witnesses to substantiate the claimed cause of injury, a jury question is presented as it is only necessary that the conclusion reached by the jury be based on an inference that is, itself, reasonable under the facts. Spotz v. Up-Right, Inc. (1972), 3 Ill. App.3d 1065, 280 N.E.2d 23; Foster v. Union Starch & Refining Co. (1956), 11 Ill. App.2d 346, 137 N.E.2d 499.
Ronald Maerz testified that the steering characteristics of the truck remained unchanged from the time he first drove it shortly after its delivery until the date of the accident. There was also evidence by plaintiff's expert witnesses that an applied weight caused the rear end of the truck to sag in a manner consistent with the installation of substandard prototype springs rather than the appropriate heavy-duty springs and that such a condition could have caused unsatisfactory handling characteristics. An adverse witness to plaintiff, Michael P. Holcomb, stated that the steering characteristics of the truck as described by Maerz were caused by negative caster and that the truck would have been seriously overloaded in the absence of heavy-duty springs. This evidence was unrebutted and sufficient, I believe, for the jury to draw a reasonable inference that an alleged defect in the truck was the proximate cause of plaintiff's injuries.
In view of the foregoing, I would reverse the judgment of the circuit court of Cook County and remand the cause for a new trial.