MICHAEL W. FALKENBURY, Plaintiff-Appellee, *v.* ELDER CADILLAC, INC., *et al.*, Defendants-Appellants.

Fifth District   No. 81—334

Opinion filed August 13, 1982.

WELCH, J., dissenting.

Otis M. Smith, General Counsel, General Motors Corp., of Detroit, Michigan and Pope and Driemeyer, of Belleville (William A. Schmitt, of counsel), for appellants.

Freeark, Harvey & Mendillo, of Belleville (Ray Freeark and James Mendillo, of counsel), for appellee.

PRESIDING JUSTICE KARNS delivered the opinion of the court:

Defendants, Elder Cadillac and General Motors Corporation, appeal from the judgment of the circuit court of St. Clair County, entered on a jury verdict, awarding plaintiff, Michael W. Falkenbury, $125,000 in this products liability action. Defendants appeal, alleging, *inter alia*, that, as a matter of law, the product in question was not unreasonably dangerous.

On June 16, 1977, plaintiff, a dental technologist, purchased a new Cadillac Coupe de Ville from Elder Cadillac, located in Belleville, Illinois, which had optional equipment including spoked wire wheel covers. A wire wheel cover consists of a disc proper with an outer row of long spokes and an inner row of shorter spokes. The spokes, positioned in the front of the wheel cover, crisscross and fit into slots along the circumference of the disc proper. In the center of the disc there is a hole, several inches in diameter, over which a center crest

piece bearing the Cadillac emblem is placed. On the back of the wheel cover there is a flat, round retainer disc plate which has a hole corresponding to the hole on the disc proper. There are five bolts on the wheel cover which secure the crest piece and the retainer disc.

In the three weeks following the purchase of the automobile, plaintiff noticed several minor problems, including a noise in the left rear wheel which he described as a "clicking" sound. On July 6, 1977, plaintiff brought the automobile to Elder to have warranty service performed and detailed a list of problems, including the noise in the left rear wheel.

Carl Newson, service manager at Elder, testifying as a section 60 witness, stated that, in response to the complaint concerning the left rear wheel, the exhaust system was aligned and a "general tightening" was performed. Newson further testified that there was no procedure for tightening the spokes on the wire wheel cover. On direct examination, Newson stated that plaintiff never complained to him concerning the wire wheel covers on his automobile.

Plaintiff testified that, when he picked up his car after having service performed, the mechanic indicated that the problems had been solved; however, the noise emanating from the left rear wheel persisted. Plaintiff further testified that he took the car in for repairs again and was informed that the service department would order a repair kit for the spoked wire wheel covers. Plaintiff telephoned Elder on several occasions, but was told the repair kit was not in stock. Newson did not recall any conversations with plaintiff concerning a wire wheel cover repair kit or the ordering of such.

On August 18, 1977, plaintiff, because of the persistent noise in the left rear wheel, endeavored to fix the wheel himself. After first removing the wheel cover from the car, plaintiff loosened the five bolts and removed the centerpiece which bears the Cadillac emblem. This created a hole that goes all the way through the wheel. Plaintiff looked inside the wheel, saw two spokes out of their holes, reached in and pushed them into their respective slots along the circumference of the disc proper. Plaintiff testified that at this point "my hand slipped or something slipped here and my hand went down into the side of that disc." This incident caused plaintiff to cut his hand, which is the complained of injury in the instant case. The cut was approximately 1½ inches long and ¼ inch deep, running from the base of the thumb toward the back of the hand.

Plaintiff filed this strict liability action for personal injuries suffered to his hand and wrist. In his second amended complaint, plaintiff alleged that the wire wheel cover was unreasonably dangerous in

one or more of the following ways:

"(a) It contained in and around the access area sharp and protruding edges;

(b) Protruding edges around the access area were not dulled, blunted, guarded or otherwise protected;

(c) No warning accompanied said product to warn of hazard involved;

(d) No instructions were provided with respect to the care, maintenance or use of said product."

Plaintiff further alleged that as a "direct and proximate result of the foregoing unreasonably dangerous and/or defective conditions," he suffered personal injuries to his right hand, and the tendons and nerves therein, that he was unable to engage in his usual professional duties to the extent he could prior to the occurrence, and that this caused him economic damage.

Dr. Dale Rosenberg, a plastic surgeon and the treating physician, testified as to the nature of plaintiff's injury. Rosenberg testified that the cut caused tendon and nerve damage and to cause such injuries the cut would have to be down to the bone on the wrist. Rosenberg further testified that he was informed plaintiff had suffered the injury from being cut on a hubcap and was of the opinion that such a laceration could have been caused by a sharp metal edge. Plaintiff's wrist was placed in a plaster cast for approximately four weeks. Plaintiff testified that after the cast was removed he experienced numbness in his thumb and a loss of dexterity that persists to the present. Plaintiff further testified that a scar developed over the area of the cut and there was a "swelling or knot" which is sensitive to the touch.

Three expert witnesses testified as to the nature and characteristics of the wire wheel cover in question.

Derwyn Severy, president of Severy, Inc., a firm involved in the evaluation of products liability cases and research in the automotive industry, testified by evidence deposition. Severy testified that the wire wheel cover is a combination of defective design and defective manufacturing. Upon disassembling the wheel, Severy noticed that the inner spokes did not receive an interlock as intended by the designer and it was apparent that the manufacturing process did not adhere to design intent. Severy observed a further defect in the stamping, particularly of the discs, which caused a sharp surface to prevail which could cause serious laceration. Severy described the disc as having a "razor-like quality." On cross-examination, Severy stated that the wheel cover had to be disassembled, with five bolts removed, before the "lacerative edge" is exposed. Severy concluded that, in his

opinion, the wheel with a disc having this "lacerative edge" is an unreasonably dangerous condition and that it is reasonably foreseeable that if the spokes on a wire wheel became loose the owner might attempt to adjust or fix them. Severy further concluded that the method used by plaintiff, reaching through the center of the wheel, while not being the "learned approach" was the most "direct approach" and, absent any instructions or published procedure, was the reasonably foreseeable method to be utilized.

H. Boulter Kelsey, an independent consultant and part-time engineering professor at Washington University in St. Louis, Missouri, testified at trial. Kelsey examined the wire wheel on two occasions and disassembled it the latter time. Kelsey testified that upon inspection he noticed that some of the outer spokes on the wheel were "loose and rattling" because they did not fit tightly into the outer diameter of the rim. Kelsey detected an "extremely sharp" edge and a raised burr on the edge of the hole caused by residual metal from the parent metal remaining as a result of the punching operation. Kelsey described the punching operation used to create the hole as follows:

> "Well, the material is placed in a machine which has a die and above that die is a punch. The die contains a hole and the punch domes down through the hole and to produce that hole, the punch is lowered through the material and into the hole which provides a shearing action around the punch at the edge of the hole in the die."

Kelsey further testified that, in his opinion, the existence of this very sharp edge constitutes an unreasonably dangerous condition, it is reasonably foreseeable that an owner of an automobile who heard a rattling in the wire wheels would attempt to fix it and that the likelihood of the owner doing so would be enhanced by the failure of the service department to remedy the problem. Kelsey delineated four methods that could be used to avoid the sharp edge made by the stamping procedure utilized.

Robert J. Smith, an automotive engineer who has been employed by General Motors for 31 years, testified at trial. Smith examined the wire wheel cover in question and stated that it is not in the same condition as it was when it was installed, specifically detecting that two of the spokes were bent so that they were in contact with other spokes. Smith testified that, in his opinion, "there is no surface on the cover [wire wheel cover] that is unreasonably dangerous from the standpoint of normal customer usage of the part." Smith further testified that upon removal of the retainer disc during disassembly of the

wire wheel cover, a typical sharp edge was evident which results when a steel part is stamped by a punch press and that any metal edge created in this manner will leave a slight burr. Smith noted that the only time the sharp edge would be exposed is if the five bolts were removed and the cover taken off. Smith stated that the metal edge in question is sufficiently sharp to cut human flesh, tendons and nerves.

At the close of all the evidence, defendants made a motion for directed verdict which was denied. On January 9, 1981, the jury returned a verdict in favor of plaintiff and against defendants in the sum of $125,000. On February 6, 1981, defendants filed a post-trial motion for judgment in accordance with the motion for directed verdict, judgment notwithstanding the verdict or in the alternative, a motion for new trial. The motions were denied, judgment was entered on the verdict, and defendants took this appeal.

Defendants assert that the trial court erred in denying the motions for directed verdict and for judgment notwithstanding the verdict in that, as a matter of law, the product was not unreasonably dangerous when used in a reasonably foreseeable manner and for the purpose for which it was intended. Plaintiff argues that whether a product is unreasonably dangerous and used in a reasonably foreseeable manner are questions of fact for the jury and that, under the evidence introduced in the instant case, defendants are not entitled to a judgment under the *Pedrick* standard. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) Thus, the issue before us on appeal is whether the evidence, when viewed in its aspect most favorable to the plaintiff, so overwhelmingly favors the defendants that no contrary verdict based on this evidence could stand under the theory advanced by plaintiff.

■ We note at the outset that plaintiff has proceeded under the theory of strict liability in tort and in order to recover under that theory, plaintiff must prove that the injury "resulted from a condition of the product, that the condition was an unreasonably dangerous one and that the condition existed at the time it left the manufacturer's control." (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 623, 210 N.E.2d 182, 188.) The Illinois Supreme Court in *Suvada* cited, with approval, section 402A of the Restatement (Second) of Torts involving the strict liability of the seller of products for physical harm caused to the user or consumer.

The rule enunciated in section 402A "applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer" and the product "must be dangerous to an ex-

tent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." (Restatement (Second) of Torts, section 402A, comment *i*, at 352 (1965).) There is no concise definition as to what constitutes an unreasonably dangerous condition. (*Burke v. Illinois Power Co.* (1978), 57 Ill. App. 3d 498, 373 N.E.2d 1354.) The court in *Burke* went on to note that "[s]ince the classification of a product as unreasonably dangerous is dependent on a variety of circumstances, it naturally falls upon a jury in most instances to make the determination as a matter of fact." (57 Ill. App. 3d 498, 511, 373 N.E.2d 1354, 1367.) We further recognize that in order for a strict liability case to go to the jury, the evidence must give rise to a "reasonable inference" that the condition was an unreasonably dangerous one. *Rockett v. Chevrolet Motor Division, General Motors Corp.* (1975), 31 Ill. App. 3d 217, 334 N.E.2d 764.

■ In the instant case it is undisputed that the disc on which plaintiff incurred his injury was sharp enough to cause the injury in question. Of course, there are many sharp edges on the various parts of an automobile that could not reasonably be classified as unreasonably dangerous considering their location and the unlikelihood that someone not a mechanic would come in contact with them. Whether a product can be classified as unreasonably dangerous depends in large part on its intended or foreseeable use. (*Winnett v. Winnett* (1974), 57 Ill. 2d 7, 310 N.E.2d 1.) Whether plaintiff cut his hand on the wire wheel cover in question or the extent of his injuries are not at issue before this court, these facts are uncontroverted; rather, in our view, the real inquiry involves whether plaintiff was acting in a reasonably foreseeable manner in attempting to repair the wheel cover himself and whether the method he utilized was reasonably foreseeable.

■ Strict liability in tort will only be imposed when a product is unreasonably dangerous when used in a reasonably foreseeable manner. (*Dunham v. Vaughan & Bushnell Manufacturing Co.* (1969), 42 Ill. 2d 339, 247 N.E.2d 401; *Winnett v. Winnett* (1974), 57 Ill. 2d 7, 310 N.E.2d 1; Illinois Pattern Jury Instructions, Civil, No. 400.06 and comment (2d ed. 1971).) The liability of a manufacturer extends only to situations in which a product is being used for its intended purpose or in a manner for which it is reasonably foreseeable that it may be used. In *Winnett*, the Illinois Supreme Court went on to note:

"A foreseeability test, however, is not intended to bring within the scope of the defendant's liability every injury that might possibly occur. *** Foreseeability means that which it is *objectively reasonable* to expect, not merely what might conceivably

occur." 57 Ill. 2d 7, 12-13, 310 N.E.2d 1, 4-5.

In the instant case the expert witnesses had different opinions as to whether plaintiff's injury occurred in a reasonably foreseeable manner. Severy and Kelsey testified that if spokes on a wire wheel become loose, the owner might attempt to fix them himself, and Kelsey further testified that the likelihood of the owner doing so would be enhanced by the failure of the service department to remedy the problem. Severy concluded that the method used by plaintiff was not the "learned approach" but was the direct and foreseeable method to be utilized. On the other hand, Smith, noting that the sharp metal edge would only be exposed if the five bolts were removed and the cover taken off, testified that the wheel cover was not unreasonably dangerous for "normal customer usage."

We have some reservations concerning the probative value of some of the "expert" testimony adduced in the instant case as it merely stated the obvious about ordinary human behavior. We cannot say that the admission of such evidence was prejudicial to defendants.

In Illinois, an expert is permitted to express his opinion on ultimate issues in a case on the theory that because the trier of fact is not required to accept the opinion of the expert, the admission of such evidence does not usurp the province of the jury. (*Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.* (1971), 49 Ill. 2d 118, 273 N.E.2d 809; *Scott v. Dreis & Krump Manufacturing Co.* (1975), 26 Ill. App. 3d 971, 326 N.E.2d 74.) "The conflicting testimony of expert witnesses normally raises an issue uniquely determinable by the trier of fact, who is in a better position to review the pertinent exhibits and assess the credibility of the witnesses." (*St. Paul Fire & Marine Insurance Co. v. Michelin Tire Corp.* (1973), 12 Ill. App. 3d 165, 179, 298 N.E.2d 289, 299. See also *Anderson v. Hyster Co.* (1977), 56 Ill. App. 3d 41, 371 N.E.2d 279.) Further, questions of foreseeability are ordinarily for the jury to resolve. (*Dunham v. Vaughan & Bushnell Manufacturing Co.* (1969), 42 Ill. 2d 339, 247 N.E.2d 401.) Whenever there is doubt as to the foreseeability of a particular use, whether the maker should have anticipated such use is an issue of fact. *Kuziw v. Lake Engineering Co.* (7th Cir. 1978), 586 F.2d 33, citing 2 J. Dooley, Modern Tort Law sec. 32.79 (1977).

In light of the foregoing and after careful review of the record, we find that there was sufficient evidence to submit the case to the jury and, therefore, the trial court did not err in denying defendants' motions for directed verdict and for judgment notwithstanding the verdict. As stated, questions of foreseeability, as well as whether a product is unreasonably dangerous, are ordinarily for the jury to de-

cide. Further, in the instant case we have the conflicting testimony of expert witnesses which raises issues of fact. As to the issue of foreseeability, we have the prior attempts of plaintiff to have the problem remedied by Elder's service department and the existence of the spoke repair kit, which could be purchased by any Cadillac owner, as proof that such problems were foreseen. We cannot say, as a matter of law, that the sharp edge on the disc is not an unreasonably dangerous condition when used in a reasonably foreseeable manner.

Defendants cite *Tibbets v. Ford Motor Co.* (1976), 4 Mass. App. 738, 358 N.E.2d 460, as a factually similar case which supports their position. In *Tibbetts*, the plaintiff injured his fingers while attempting to remove a wheel cover from his automobile. In partially denying defendant's motion for directed verdict, the trial court allowed four counts in this negligence action to go to the jury. The jury imposed liability against defendant for "negligent failure to inspect and test the wheel cover." On appeal, the appellate court reversed the trial court, holding that defendant's motion for directed verdict should have been allowed. While we recognize that *Tibbetts*, like the instant case, involved an injury incurred as a result of contact with a wheel cover, we note initially that *Tibbetts* was a negligence action and, in the instant case, plaintiff proceeded under the theory of strict liability in tort. Further, the court in *Tibbetts* expressly stated that that case did not involve a wheel cover slot with hidden sharp edges that could seriously injure someone merely inserting his hand. For the reasons stated, we find *Tibbetts* distinguishable from the instant case.

Defendants also assert that the trial court erred in denying their alternative motion for new trial in that the cumulative effect of certain trial errors deprived defendants of a fair trial. Without detailing defendants' specific contentions, we note that we agree with plaintiff that, considering the length of the trial and the nature of the litigation, the trial was remarkably free of error and well tried on both sides. We have reviewed the alleged errors and find none to be prejudicial as to deprive defendants of a fair trial.

One matter deserves mention. Defendants complain of testimony concerning other alleged defects in the construction of the wheel covers and the admissibility of a spoke repair kit and a service bulletin that made reference to the repair kit. This evidence was admissible, not as proof of additional defects, but simply to show that the spokes did in fact rattle, that being the reason the plaintiff undertook to repair the wheel cover. The availability of the spoke repair kit was relevant to the question of defendants' knowledge that it was reasonably foreseeable that the spokes might become loosened and

that the repair of the wheel cover might be undertaken by an owner.

For the foregoing reasons, the judgment of the circuit court of St. Clair County, entered on the jury verdict, is affirmed.

Affirmed.

HARRISON, J., concurs.

JUSTICE WELCH, dissenting:

The majority employs many often-used rules of law, derived from section 402A of the Restatement (Second) of Torts. I cannot take issue with this language, as it has become a well-established part of the rhetoric of strict products liability. But in applying these generalities to the facts of this case, the majority has reached a result which, in effect, substitutes the foreseeability of the accident for the unreasonably dangerous nature of the product as the outer limit of liability. Because this is an unprecedented and unrealistic expansion of the law of products liability, I must dissent from the decision of the majority.

In its opinion, the majority notes that the plaintiff must show that the product was unreasonably dangerous when used in a reasonably foreseeable manner. To me, this involves two inquiries: first, was the plaintiff using the product in a reasonably foreseeable manner, and second, was the product unreasonably dangerous for that use. In this case, the majority confines itself to the first of these questions when it states that "the real inquiry involves whether plaintiff was acting in a reasonably foreseeable manner in attempting to repair the wheel cover himself and whether the method he utilized was reasonably foreseeable." (109 Ill. App. 3d 11, 17, 440 N.E.2d 180, 185.) It answers both foreseeability questions in the affirmative, and thus finds liability.

I, too, agree that it was foreseeable that the plaintiff would work on the wheel cover. In fact, there are virtually no automotive repairs which I cannot imagine some consumer, somewhere, attempting at home. It is common knowledge that, in addition to spoke kits, other parts are available individually from dealers and independent suppliers. An entire car can be built, rebuilt or repaired with these parts, and in these times it is foreseeable that more people will decide to undertake these tasks themselves. Yet, it is the logical conclusion to the reasoning of the majority that if someone is cut while performing home auto repairs, of whatever sort, then he can recover from the manufacturer of the car.

The majority attempts to disclaim these obvious results of its deci-

sion by stating that "there are many sharp edges on the various parts of an automobile that could not reasonably be classified as unreasonably dangerous considering their location and the unlikelihood that someone not a mechanic would come in contact with them." (109 Ill. App. 3d 11, 17, 440 N.E.2d 180, 185.) But this so-called limitation of the holding is actually no limitation at all. If foreseeability is the boundary of liability, then, as I have noted above, virtually any car-repair injury, being reasonably foreseeable, is actionable. If the location of the sharp edge is the test, then what about a sharp edge near the carburetor? Behind the dashboard? In the distributor? Under the valve covers? The majority provides no reason that a sharp edge in these locations, all of which are common trouble spots, would not give rise to the manufacturer's liability, while an injury received after the removal and disassembly of the wheel cover, is actionable. I fail to detect any obvious difference between the former locations and the latter, nor does the majority suggest any.

The flaw with the majority's opinion is that it unsuccessfully attempts to confine its result to "foreseeable" repairs, whatever they may be, while ignoring the very limitation which section 402A itself places on liability—namely, that the product be unreasonably dangerous. Whether a product may be considered to be unreasonably dangerous is a question of policy, involving such factors as

> "(1) the usefulness and desirability of the product, (2) the availability of other and safer products to meet the same need, (3) the likelihood of injury and its probable seriousness, (4) the obviousness of the danger, (5) common knowledge and normal public expectation of the danger, particularly for established products, (6) the avoidability of injury by care in use of the product, including the effect of instructions or warnings, and (7) the ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive." (63 Am. Jur. 2d, *Products Liability* sec. 132 (1972).)

In finding liability because the plaintiff's repairs were reasonably foreseeable, the majority has stopped short of discussing these issues and thus fails to meet the policy objections which the appellants raise to challenge the judgment against them. Moreover, by analyzing only the plaintiff's conduct, the majority also departs from the fundamental tenet of products liability law that the focus in such a case should be on the product itself. *Kerns v. Engelke* (1979), 76 Ill. 2d 154, 390 N.E.2d 859.

Simply stated, the broad question posed by this case is what standard of performance is to be demanded from an auto manufac-

turer. The plaintiff's complaint alleged that his Cadillac was defective because the edges were sharp in the area under the center disc of the wheel cover, because no warning was provided to protect the consumer from that hazard, and because no instructions were given. If, as the majority holds, these defects are actionable, then a car is reasonably safe only if virtually every potentially sharp edge is trimmed with jewelry-like precision, if the car is bedecked with warning stickers for each sharp edge which could remain, and if a service manual is provided to the buyer. I cannot believe that a car which falls short of these standards is "unreasonably dangerous." An examination of the relevant case law reveals more realistic guidelines.

Most of the reported decisions in which a plaintiff has recovered damages for a defective automobile have involved the inability of the car to serve its primary function—transportation. Engine, transmission, brake, and steering failure are typical subjects of these cases. (Annot., 78 A.L.R.2d 460 (1961); R. M. Goodman, Automobile Design Liability (1970, Supps. 1971—1977, 1981).) Such a defect is not presented here. Instead, we are faced with a cutting surface which injured the plaintiff only when he acted to repair his car on his own.

It has been held that a plaintiff who is cut on a sharp edge in the passenger compartment of a car may recover damages for his injuries. (*Ford Motor Co. v. Zahn* (8th Cir. 1959), 265 F.2d 729 (passenger thrown into jagged edge on ashtray in 1956 Ford).) In certain situations, it has been held that one who collides with a sharp edge on the exterior of a car is also entitled to recover damages. (Compare *Green v. Volkswagen of America, Inc.* (6th Cir. 1973), 485 F.2d 430 (girl's finger severed in body vent of parked 1956 microbus while she was playing ball in its vicinity), and *Passwaters v. General Motors Corp.* (8th Cir. 1972), 454 F.2d 1270 (motorcyclist cut on decorative flippers on wheel cover during collision with 1964 Buick), with *Schneider v. Chrysler Motors Corp.* (8th Cir. 1968), 401 F.2d 549 (car owner cut on wing vent window of 1960 Valiant while trying to look into car in dark garage to see if keys were in it), *Hatch v. Ford Motor Co.* (1958), 163 Cal. App. 2d 393, 329 P.2d 605 (child walked into radiator ornament on 1939 Ford), *Kahn v. Chrysler Corp.* (S.D. Tex. 1963), 221 F. Supp. 677 (child rode bicycle into tailfin of 1957 Dodge).) Similarly, plaintiffs who have been cut while performing what can best be described as "routine maintenance" have established the liability of the manufacturer. (*Kikis v. Ford Motor Co.* (Fla. App. 1980), 386 So. 2d 306, *rev'd* (Fla. 1981), 401 So. 2d 1341, *on remand* (Fla. App. 1981), 405 So. 2d 1061 (owner cut on hole of wheel cover while removing it to change tire); *Vlahovich v. Betts Machine Co.* (1970), 45

Ill. 2d 506, 260 N.E.2d 230 (truck driver cut by plastic lens of clearance light which shattered while he was changing a bulb). See also *Pouncey v. Ford Motor Co.* (5th Cir. 1972), 464 F.2d 957 (car owner cut by blade which broke off from radiator fan while owner was adding anti-freeze to car).) Also, I might add that the plaintiff in *Tibbetts v. Ford Motor Co.* (1976), 4 Mass. App. 738, 358 N.E.2d 460, was attempting to perform such routine maintenance when he was injured, namely, changing a tire. However, he sought to remove the wheel cover by inserting his bare hand into the decorative slots of the cover and pulling it, instead of trying to pry the cover loose. (Compare *Kikis v. Ford Motor Co.*) *Tibbetts* should properly be thought of as an example of a misused product. That case is not distinguishable from the present case, as the majority claims, because it was a negligence action, since the court specifically answered the question of whether the wheel cover was defective, which is a prerequisite to proving a case either in negligence or in strict liability.

All of the cases discussed above limit liability to those plaintiffs who were automobile passengers, those who collided with the automobiles, and those who were performing routine maintenance such as changing tires, light bulbs and filters or adding vital fluids. It is reasonable to expect a manufacturer to trim those edges which could come in contact with someone engaging in these common activities. But to require that all surfaces between the center crest piece and the retaining disc of the wheel cover be completely safe for human contact would effectively require all surfaces anywhere in the car to be machined to perfection.

Nor does *Elliott v. General Motors Corp.* (7th Cir. 1961), 296 F.2d 125, justify such a result. There, the plaintiff was a mechanic who was employed to replace the piston rings on a Chevrolet. While he lay on his back underneath the car with his hand extended through an opening in a splash shield under the front end of the car, removing fan pulley bolts and loosening connecting rod bolts with a socket wrench, his hand slipped from the wrench, throwing his right wrist against a sharp edge on the shield. Although replacing the piston rings is certainly not routine maintenance, this case is of no assistance to the plaintiff, because the opening in the shield was designed specifically to permit mechanics to gain access to the engine compartment. There is no proof that the opening under the wheel cover of the plaintiff's Cadillac was intended to provide any sort of access for repair work, despite the plaintiff's reference in his complaint to this space as an "access area." In fact, the only way that the sharp edge could be exposed was for the plaintiff to remove the wheel cover and

24

then remove the five bolts in the wheel cover in order to disassemble it.

The majority's decision to hold the defendants liable for failure to correct a sharp edge in an opening underneath the center crest piece of the wheel cover means that auto manufacturers must trim all possibly sharp edges, of glass, plastic, or metal, wherever they are located, so as to make the car as safe as a child's toy. Such a standard of perfection in workmanship, while a commendable goal, cannot be the test of whether a product is unreasonably dangerous. Instead, consideration of the relevant policy issues and cases discussed above shows that a sharp edge on a car is not unreasonably dangerous unless it is likely to come in contact with a passenger, with someone who collides with the vehicle, or with someone who performs routine maintenance on the car. Such an edge would also be unreasonably dangerous if it were on a part designed as an access area. (*Elliott.*) Since none of these descriptions applies to the metal edge in question, there can be no reasonable inference that the automobile was unreasonably dangerous (*Rockett v. Chevrolet Motor Division, General Motors Corp.* (1975), 31 Ill. App. 3d 217, 334 N.E.2d 764), and therefore the court erred in submitting this case to the jury.